**F I L E D**

PUBLISH

**October 11, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES PATRICK MALICOAT,

   Petitioner-Appellant,

  v.

   No. 03-6301

MIKE MULLIN, Warden, Oklahoma
State Penitentiary at McAlester,

   Respondent-Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-01-018-M)**

---

Scott W. Braden, Assistant Federal Public Defender, Death Penalty Federal
Habeas Corpus Division, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General, Criminal Division (W.A. Drew
Edmondson, Attorney General, with her on the brief), State of Oklahoma,
Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **HENRY**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.

---

**HENRY,** Circuit Judge.

---

Petitioner James Patrick Malicoat was convicted in Grady County, Oklahoma District Court of first-degree felony murder by child abuse. Following the jury's recommendation, the trial court imposed the death penalty.

The Oklahoma Court of Criminal Appeals (OCCA) affirmed Mr. Malicoat's conviction and sentence. See State v. Malicoat, 992 P.2d 383 (Okla. Crim. App. 2000). Then, in an unpublished opinion, the OCCA denied Mr. Malicoat's application for post-conviction relief. Subsequently, the federal district court denied Mr. Malicoat's 28 U.S.C. § 2254 habeas petition.

In this appeal, Mr. Malicoat argues that: (1) his counsel on direct appeal was ineffective for failing to argue that a carving in the courtroom bearing the inscription "AN EYE FOR AN EYE AND A TOOTH FOR A TOOTH" deprived him of a fair trial. Mr. Malicoat also argues that the OCCA erred by (2) concluding that, under Beck v. Alabama, 447 U.S. 625, 627 (1980), he was not entitled to an instruction on the lesser-included offense of second-degree depraved-mind murder; (3) concluding that no finding of Mr. Malicoat's intent to kill was required to support the death sentence, in violation of the Eighth Amendment principles set forth in Enmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137 (1987); (4) rejecting Mr. Malicoat's claim that the prosecution's closing arguments during the guilt and sentencing stages deprived him of a fair trial; (5) concluding that the admission of a photograph of the victim

while alive, although error, was harmless; (6) rejecting Mr. Malicoat's claim that he received ineffective assistance of counsel at trial. Finally, Mr. Malicoat argues that (7) the cumulative effect of these errors also deprived him of a fair trial.

We are not convinced by these arguments. First, the display of the "EYE FOR AN EYE" inscription on the carving in the courtroom did not constitute structural error. Thus, Mr. Malicoat's Sixth Amendment right to effective assistance of counsel was not violated by his attorney's failure to challenge it on direct appeal. Second, as to Mr. Malicoat's <u>Enmund/Tison</u> argument, we conclude that the OCCA did not unreasonably apply federal law in holding that, in order to impose the death penalty, the prosecution was not required to prove that Mr. Malicoat intended the death of the victim or acted in reckless disregard of human life. As to Mr. Malicoat's <u>Beck</u> claim, we similarly conclude that the OCCA did not unreasonably apply federal law in holding that Mr. Malicoat was not entitled to an instruction on second-degree depraved-mind murder. Mr. Malicoat's claims of prosecutorial misconduct, admission of prejudicial evidence, ineffective assistance of trial counsel, and cumulative error also lack merit. Accordingly, we conclude that the district court properly denied Mr. Malicoat's 28 U.S.C. § 2254 petition.

I. BACKGROUND

The relevant facts are set forth in the OCCA's opinion on direct appeal. See 992 P.2d at 391-92. As a result, we only briefly summarize them here.

At about 8:25 p.m. on February 21, 1997, Mr. Malicoat and his girlfriend, Mary Ann Leadford, brought their thirteen-month-old daughter, Tessa Leadford, to the county hospital emergency room. The hospital staff determined that Tessa had been dead for several hours. Her face and body were covered with bruises. She had a large mushy closed wound on her forehead and three human bite marks on her body. A post-mortem examination revealed two subdural hematomas from the head injury, and severe internal injuries, including broken ribs, internal bruising and bleeding, and a torn mesentery. The medical examiner concluded the death was caused by a combination of the head injury and internal bleeding from the abdominal injuries.

Tessa and Mary Ann Leadford had begun living with Mr. Malicoat on February 2, 1997. Mr. Malicoat worked a night shift on an oil rig and was responsible for Tessa's care during the day.

Mr. Malicoat admitted that he routinely poked Tessa hard in the chest area and occasionally bit her, both as a disciplinary measure and in play. When interviewed by police officers, Mr. Malicoat initially denied knowing how Tessa had received the severe head injury. Subsequently, he suggested that she had

fallen and hit the edge of a waterbed frame. However, he eventually admitted that he had hit her head on the bed frame one or two days before she died. He also admitted that, at about 12:30 p.m. on February 21, while Ms. Leadford was at work, he twice punched Tessa hard in the stomach. He stated that Tessa stopped breathing and that he gave her CPR. According to Mr. Malicoat, when Tessa began breathing again, he gave her a bottle containing a soft drink and went to sleep next to her on the bed. When he awoke around 5:30 p.m., she was dead. He put Tessa in her crib and covered her with a blanket, spoke briefly with Ms. Leadford, and went back to sleep in the living room. Ms. Leadford eventually discovered that Tessa was not moving, and the couple took her to the emergency room.

Seeking to explain the events leading to Tessa's death, Mr. Malicoat reported that he had worked all night, had car trouble, took Ms. Leadford to work, and was exhausted. He added that he had hit Tessa when she would not lie down so he could sleep. He said he sometimes intended to hurt Tessa when he disciplined her, but never meant to kill her. He told the officers that he had suffered through extreme abuse as a child that he did not realize his actions would seriously hurt or kill Tessa.

The state charged Mr. Malicoat with first-degree felony murder by child abuse under OKLA. STAT. tit. 21, § 701.7(C). A first trial ended with a mistrial

-5-

during jury selection. After the second trial, the jury convicted Mr. Malicoat of the murder charge. Then, upon hearing additional evidence at sentencing, the jury found two aggravating factors: (1) that the murder was especially heinous, atrocious, and cruel and (2) that there existed a probability that Mr. Malicoat would commit criminal acts of violence that constituted a continuing threat to society. See OKLA STAT. tit. 21, § 701.12(4) and (7). Following the jury's recommendation, the trial court imposed the death penalty.

The OCCA affirmed Mr. Malicoat's conviction and sentence on direct appeal and then rejected his petition for post-conviction relief. Subsequently, the federal district court denied Mr. Malicoat's federal habeas petition.

## II. DISCUSSION

We begin by addressing the standard of review. Then, we proceed to the merits of Mr. Malicoat's claims.

### A. Standard of Review

Because Mr. Malicoat filed his § 2254 habeas corpus petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), its provisions apply to this appeal. See Smallwood v. Gibson, 191 F.3d 1257, 1264 (10th Cir. 1999). Under AEDPA, a federal court may only grant habeas

relief on a claim adjudicated on the merits by a state court if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). In addition, AEDPA directs federal courts to presume that the factual findings of the state court are correct unless the petitioner can rebut this presumption by clear and convincing evidence. See id. § 2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-25 (10th Cir. 2004).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court provided guidance as to when a state court decision may be deemed "contrary to" or "an unreasonable application of" established Supreme Court precedent pursuant to section 2254(d)(1). As to the former term, the Court explained that a state court decision is "contrary to" the Court's clearly established precedent in two circumstances: (1) when "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" and (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" the result reached by the Supreme Court. Id. at 405-06. As to the latter term, the Court explained that a state court decision constitutes "an unreasonable application" of Supreme

Court precedent if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Thus, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000) (discussing Williams).

As we discuss more fully below, with regard to Mr. Malicoat's claims regarding ineffective assistance of appellate and trial counsel, the OCCA applied state law standards that differ from the federal standard. We therefore engage in de novo review of those claims. In contrast, the OCCA based its rejection of Mr. Malicoat's Beck, Enmond-Tison, prosecutorial misconduct, and evidentiary claims on its reading of federal law. Therefore, as to those claims, we apply AEDPA's standard of review and consider whether the OCCA's decision was unreasonable. Finally, as to Mr. Malicoat's claim for cumulative error, it is not clear that the OCCA applied the federal standard. Accordingly, we afford Mr. Malicoat the benefit of the doubt and engage in de novo review of that claim as well.

-8-

B. Merits

1. Ineffective Assistance of Appellate Counsel
(in failing to challenge the "EYE FOR AN EYE" inscription)

Mr. Malicoat first argues that he received ineffective assistance of counsel on direct appeal. His claim is based upon a wooden carving on the wall directly behind the judge's bench in the Grady County, Oklahoma courtroom in which he was tried. The carving depicts a man and a woman holding a sword bearing the inscription "AN EYE FOR AN EYE AND A TOOTH FOR A TOOTH."[1]

Mr. Malicoat objected to the inscription during jury selection in his first trial, and the judge responded by covering it up. However, a different judge

---

[1]     Mr. Malicoat attached two photographs of the carving to his state court application for post-conviction relief, and they are attached as an exhibit to this opinion.

A 1976 article from the Chickasha Daily Express reports that the carving was made by Derald Swineford in 1934. The article states that the carving is entitled "Justice Tempered by Mercy." Fed. Ct. Rec. doc. 23, Ex. A (Response to Petition for Writ of Habeas Corpus, filed Dec. 4, 2001).

According to the Daily Express, "the sword with the harsh inscription 'An Eye for an Eye and a Tooth for a Tooth' carving on the blade and the winged lions at the bottom represents the early Babylonian code." Id. "The male figure . . . represents the [Grecian] practice which was the same as that of Hammurabi, as he is grasping the sword of justice." Id.

The female figure represents Mercy. "[She] represents the Roman element since it seems the Romans were the first to really try a case and decide it not on the belief that the party guilty of the misdeed should suffer in the same manner as the recipient but that a group of men should weigh the causes of the misdeed and decide in what manner the guilty party should be punished or whether he was deserving of any punishment." Id.

There is no indication in the record that the title appears anywhere on the carving, and the parties do not so suggest.

presided over the second trial, and he overruled Mr. Malicoat's objection. On direct appeal, Mr. Malicoat's counsel did not argue that the inscription deprived him of a fair trial.

Mr. Malicoat now maintains that the failure to advance this argument was constitutionally deficient. In particular, he argues that the trial judge's failure to cover the inscription constituted "a structural error," the kind of error that "necessarily render[ed] [his] trial fundamentally unfair," Rose v. Clark, 478 U.S. 570, 577 (1986) and that "def[ies] analysis by 'harmless-error' standards," Arizona v. Fulminante, 499 U.S. 279, 309 (1991). As a result, he asserts, there is a reasonable probability that, if his appellate counsel had challenged the "EYE FOR AN EYE" inscription, Mr. Malicoat's capital sentence would have been overturned.

In assessing this argument, we begin by examining the OCCA's adjudication of this claim in order to determine the appropriate standard of review. Then, we outline the framework for evaluating claims alleging ineffective assistance of appellate counsel. Finally, we turn to the particular error alleged here, the failure to challenge the "EYE FOR AN EYE" inscription as an improper invocation of religious principle in a capital case, and we consider whether the inscription constituted a structural error, which, if argued by counsel, would have led the OCCA to overturn Mr. Malicoat's sentence.

-10-

A.  The OCCA's decision

Mr. Malicoat first raised this claim in post-conviction proceedings in the OCCA.  There, he argued that the inscription constituted a structural error because it "creat[ed] an establishment of religion at his public trial; and it denied him a reliable sentencing free from arbitrary, capricious, and unreliable state action, in violation of the Eighth and Fourteenth Amendments."  Original Application for Post-Conviction Relief in a Death Penalty Case, at 34 (filed Nov. 19, 1999).  Mr. Malicoat submitted photographs of the carving and the inscription, but he offered no evidence that the jury could see the inscription given its vantage point.  He argued that his counsel's failure to challenge the inscription on direct appeal constituted ineffective assistance of counsel in violation of the Sixth Amendment.

In rejecting this argument, the OCCA applied the three-part test for ineffective assistance of counsel claims set forth in its prior decisions.  See Order Denying Application for Post-Conviction Relief and Application for Exercise of Original Jurisdiction, filed Feb. 1, 2000, at 3 (citing Walker v. State, 933 P.2d 327, 333 (Okla. Crim. App. 1997)).[2]  Under that standard, "omission of

_____

[2]     Notably, Judge Chapel vigorously dissented.     He concluded that:

the sign over the Grady Courthouse bench, reading "AN EYE FOR AN EYE & A TOOTH FOR A TOOTH," [is]  inappropriate in any criminal

(continued...)

-11-

meritorious claims [from an appellate brief] will 'rarely, if ever,' constitute deficient performance." Id. at 3 (quoting Bryan v. State, 948 P.3d 1230, 1233 (Okla. Crim. App. 1997)).

This circuit has held that the OCCA's three-part standard does not comport with the established federal standard for evaluating Sixth Amendment ineffective assistance of counsel claims under Strickland v. Washington, 466 U.S. 668, 687 (1984). See Cargle v. Mullin, 317 F.3d 1196, 1203-04 (10th Cir. 2003) (concluding that the OCCA's decisions appeared to require a petitioner asserting ineffective assistance of appellate counsel to establish not only that counsel had omitted an issue from an appeal "but also an improper motive or cause behind counsel's omission of the issue" and that this approach "appears to involve the very inquiry that the Supreme Court specifically repudiated"). Accordingly, we will not defer to the OCCA's conclusion. See id. at 1205 ("Because the OCCA's

---

[2](...continued)
> trial. As I have previously said, in the context of a capital trial I believe that sign is outrageous and unconstitutional. This violates Art. I, § 2 of the Oklahoma Constitution and the 1st, 5th, and 14th Amendments of the United States Constitution.

Order Denying Application for Post-Conviction Relief and Application for Exercise of Original Jurisdiction, filed Feb. 1, 2000 (Chapel, J., dissenting) (footnote omitted). In a prior case, Judge Chapel also dissented on the same grounds. See Anderson v. Oklahoma, No. PC-99-818 (Okla. Crim. App. Jan. 26, 2000) (Chapel, J., dissenting).

analysis of petitioner's appellate ineffectiveness allegations deviated from the controlling federal standard, . . . it is not entitled to deference."). Instead, we examine Mr. Malicoat's claim of ineffective assistance of appellate counsel de novo, applying the familiar standard established by Strickland. Id.

B. Ineffective Assistance of Appellate Counsel

In order to prevail, Mr. Malicoat must first demonstrate that his appellate counsel's performance was deficient. Secondly, Mr. Malicoat must demonstrate that his counsel's performance prejudiced his defense. Strickland, 466 U.S. at 687.

Deficient performance entails an error so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Id. Counsel's representation must fall below "an objective standard of reasonableness." Id. at 688. As to prejudice, Mr. Malicoat must show that "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The Supreme Court has defined "[a] reasonable probability" as "a probability sufficient to undermine confidence in the outcome" of the proceeding. Id.

When, as here, a habeas petitioner's Sixth Amendment claim is based upon appellate counsel's failure to raise a particular issue, the Supreme Court has

recognized that "appellate counsel who filed a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Jones v. Barnes, 463 U.S. 745 (1983)). Indeed, the winnowing out of weaker arguments so that counsel may focus the court's attention on those more likely to prevail "is the hallmark of effective advocacy." Tapia v. Tansy, 926 F.2d 1554, 1564 (10th Cir. 1991).

Nevertheless, in certain circumstances, appellate counsel's omission of an issue may constitute ineffective assistance under Strickland. In analyzing such claims, the court must consider the merits of the omitted issue. Smith, 528 U.S. at 288; Cargle, 317 F.3d 1202. "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance." Cargle, 317 F.3d at 1202 (discussing Smith, 528 U.S. at 288). On the other hand, if the omitted issue has merit but is not so compelling, we must examine the issue in relation to the rest of the appeal. Id. Habeas relief is warranted only if the petitioner establishes a reasonable probability of a favorable result had his appellate counsel raised the omitted issue. Neill v. Gibson, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001) (applying Strickland, 466 U.S. at 694).

## C. Alleged Structural Error

Here, the issue omitted from Mr. Malicoat's counsel's brief on direct appeal involves his right to a fair trial under the Sixth and Fourteenth Amendments and his Eighth Amendment right to an individualized jury determination as to whether the death penalty should be imposed. Mr. Malicoat notes that the phrase "an eye for an eye and a tooth for a tooth" occurs in three chapters of the Old Testament. See Aplt's Br. at 10-11 (citing LEVITICUS 24:19-21; EXODUS 21:24; and DEUTEROMONY 19:21). He thus maintains that the inscription on the carving in the Grady County courtroom constituted a "specific Biblical exhortation[] demanding a sentence of death that [was] part of the official government facility." Aplt's Br. at 10. In his view, the inscription "told the jury if it found Mr. Malicoat guilty it should sentence him to death," it "prevent[ed] the jury from making the specific findings required to determine the existence of aggravating and mitigating circumstances," and it "announc[ed] to the jurors [that] the State chooses the death penalty for murderers, regardless of what the instructions say." Id. at 11-12.

In the state post-conviction proceedings, Mr. Malicoat characterized the trial court's refusal to cover the "EYE FOR AN EYE" inscription as a structural error. See Original Application For Post-Conviction Relief in a Death Penalty Case, at 9-34 (filed Nov. 19, 1999). He argued that the display of the inscription

-15-

throughout the trial violated the Establishment Clause and rendered his death sentence reversible per se. Although, in his brief to this court, Mr. Malicoat does not use the term "structural error," he advances essentially the same argument that he did in the state post-conviction proceedings. See Aplt's Br. at 11 (stating that the inscription on the carving "undermined every aspect of the Constitutional framework mandated for capital trials").

In advancing this argument, Mr. Malicoat faces a high hurdle. As the Supreme Court has often observed, structural errors occur in only a "very limited class of cases." Johnson v. United States, 520 U.S. 461, 468 (1997). Errors deemed to be "structural" have included the total deprivation of the right to counsel at trial, a biased presiding judge, the systematic exclusion of members of the defendant's own race from a grand jury, the denial of the right to self-representation at trial, the denial of the right to a public trial, the denial of the right to have a district judge (rather than a magistrate judge) preside over jury selection, and a defective reasonable doubt instruction. See United States v. Pearson, 203 F.3d 1243, 1260-61 (10th Cir. 2000) (collecting cases). In contrast to these fundamental deficiencies in the trial process, most errors can be harmless. "If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." Rose v. Clark, 478 U.S. 570, 579 (1986).

Here, Mr. Malicoat cites no decision holding that a jury's viewing of extraneous material analogous to the "EYE FOR AN EYE" constitutes a structural error. We too have found none.

Moreover, Mr. Malicoat's structural error argument is undermined by our decisions concerning jurors' exposure to particular items of extraneous information about pending matters. See, e.g., United States v. Scull, 321 F.3d 1270, 1279-81 (10th Cir.) (considering juror's exposure to an inaccurate report of attorney-juror contact), cert. denied sub nom., Bono v. United States, 540 U.S. 804 (2003); Vigil v. Zavares, 298 F.3d 935, 940-43 (10th Cir. 2002) (considering jurors' exposure to fellow juror's personal account of how long it took to drive a certain route—a matter relevant to the prosecution's alleged time line and the defendant's alibi). On direct appeal, "[w]hen members of a jury are exposed to extraneous information about a matter pending before the jury[,] a presumption of prejudice arises." Scull, 321 F.3d at 1280 (citing Remmer v. United States, 347 U.S. 227, 229 (1954)). "The presumption of prejudice weighs heavily in favor of the defendant but is not insurmountable" and "the government can seek to prove the exposure to extraneous information was harmless beyond a reasonable doubt." Id.

In habeas corpus proceedings, this presumption generally does not apply. Vigil, 298 F.3d at 940 n.6 (applying Brecht v. Abrahamson, 507 U.S. 619, 637

(1993)).  Thus, the court may grant relief only if the extraneous information "'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 940 (quoting Brecht, 507 U.S. at 637).  In deciding whether such information substantially influenced the jury's verdict the court may consider a number of factors, such as: (1) the degree to which the jury discussed and considered the extrinsic information; (2) the extent to which the jury had difficulty reaching a verdict prior to receiving the improper evidence; (3) the degree to which the information related to a material fact in the case; (4) when the jury received the extrinsic evidence; (5) the strength of the legitimate evidence; and (6) whether the extrinsic evidence merely duplicates evidence properly before the jury.  See id. at 941 (collecting cases).  This case-specific, record-intensive approach is inconsistent with Mr. Malicoat's assertion of structural error.

Additionally, we have found no federal cases involving prosecutors' use of religious material in closing arguments that have characterized such misconduct as structural error.  For example, in Sandoval v. Calderon, 241 F.3d 765, 775-776 (9th Cir. 2001), the prosecutor told the jury in closing argument that God approved of the death penalty for people like the defendant, whom he characterized as evil and as defying the authority of the state.  He explained that, by imposing the death penalty, the jury would be "doing what God says."  Id. at 776.  Although the court overturned the defendant's conviction on the grounds of

prosecutorial misconduct, it did not apply the doctrine of structural error. Instead, it concluded that the prosecutor's remarks had actually prejudiced the defendant. In support of that conclusion, the Sandoval court examined "the likely effect of the statements in the context in which they were made." Id. at 778. The court considered the fact that "this was not a case in which the evidence overwhelmingly supported the jury's verdict" and that, after three days of deliberation, the jury had informed the judge that it was hopelessly deadlocked. Id. at 779.

Confronting a similar argument by the prosecutor, the Eleventh Circuit also examined actual prejudice. See Romine v. Head, 253 F.3d 1349, 1368-71 (11th Cir. 2001). The court inquired whether, absent the improper argument, there was a reasonable probability that the result would not have been a death sentence. In answering that question affirmatively, the court considered the fact that the trial was "saturated with evidence relating to religion," that "there was nothing ambiguous or unintentional about the prosecutor's improper argument," that the court did not give a curative instruction, that at least two members of the jury had discussed the prosecutor's interpretation of the Bible, that one juror "cared enough about the argument to check one of the scriptures that the prosecutor had used to ensure that he had quoted it correctly,"[3] and the relative strength of the

---

[3] The jurors had testified about their deliberations at an evidentiary hearing in the
(continued...)

-19-

aggravating and mitigating circumstances surrounding the murder.  Id. at 1369-70; see also Coe v. Bell, 161 F.3d 320, 351 (6th Cir. 1998) (concluding that the prosecutor's invoking the Bible, which included using the phrase "[w]hosoever sheddeth man's blood, by man shall his blood be shed," did not "so taint[] the proceedings that they constitute[d] reversible error"); Hill, 952 P.2d at 692-700 (concluding that prosecutorial misconduct, including invoking the Bible and using the phrase "an eye for an eye" during closing argument, along with other errors, "created a negative synergistic effect" that deprived the defendant of a fair trial); Long, 883 P.2d at 177 ("Given the strong evidence against the [defendant-]appellant, we find beyond a reasonable doubt that the prosecutor's improper appeal to religious bias in the jurors was harmless."); State v. Shurm, 866 S.W.2d 447, 464 (Mo. 1993) (concluding that the prosecutor's statement in closing argument that "I'm asking you to take an eye for an eye" was an "isolated reference" that did "not rise to the level of plain error").  But see State v. Chambers, 599 A.2d 630, 644 (Pa. 1991) (not using the term "structural error" but vacating a death sentence and holding that the "reliance in any manner upon the Bible or any other religious writing in support of a penalty of death is reversible error per se and may subject violators to disciplinary action").

---

[3](...continued)
state post-conviction proceedings.     See 253 F.3d at 1362-63.

These decisions convince us that the trial judge's refusal to cover the "EYE FOR AN EYE" inscription was not a structural error. Here, in contrast to the cases involving the use of religious authority in closing argument, the jury was not directly told to apply the "eye for an eye" maxim. Although the inscription was displayed behind the judge's bench, there is no evidence that the inscription caused the jurors to bring Bibles into deliberation. Nor is there any evidence that any of the jurors invoked the "eye for an eye" maxim in their discussions. Moreover, although the inscription directly quotes a portion of a biblical passage, it did not explicitly inform the jury that it should apply religious principles in arriving at its decision. Indeed, it is possible that the jury understood the carving to suggest that mercy should trump retaliation (although there is no evidence to support that proposition either). Finally, the jury was properly instructed on the weighing of aggravating and mitigating circumstances in determining whether to impose the death penalty. See State Ct. Rec. at 350-365 (sentencing phase instructions). As a result, unlike the cases involving prosecutorial references to the Bible in closing argument, the integrity of the sentencing proceeding was not threatened in a fundamental way.

Accordingly, we conclude that the trial judge's refusal to cover the inscription was not a structural error, and that, as a result, Mr. Malicoat's

counsel's failure to advance a structural error argument on direct appeal did not constitute ineffective assistance of counsel in violation of the Sixth Amendment. Thus, Mr. Malicoat is not entitled to habeas relief on this claim.

## 2. Lesser-Included Offense Instruction

Mr. Malicoat argues that the trial court erred in refusing to instruct the jury on the offense of second-degree "depraved mind" murder. See Willingham v. State, 947 P.2d 1074, 1081 (Okla. Crim. App. 1997) (discussing the elements of that offense), overruled on other grounds by Shrum v. State, 991 P.2d 1032, 1034 (Okla. Crim. App. 1999). He contends that the evidence was sufficient to support such an instruction, invoking his lack of sleep on the day of the killing, his statement that he did not hit Tessa on purpose, and the other stresses that he suffered then. He adds that the district court denied his request to present evidence of the abuse that he suffered as a child. According to Mr. Malicoat, this personal history led him to act abusively when under stress, and, if the jury had considered this evidence, it could have convicted him of "depraved mind" murder.

In rejecting this argument, the OCCA relied on evidence indicating that the killing was "part of a pattern of intentional abuse . . . rather than an impulsive outburst." Malicoat, 992 P.2d at 396. The court thus concluded that "[t]aken as a

whole, [the evidence] does not support a lesser included instruction on depraved mind murder." Id.

Mr. Malicoat's argument is grounded in the Due Process Clause of the Fourteenth Amendment, which ensures that "a sentence of death [may not] . . . be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Beck v. Alabama, 447 U.S. 625, 627 (1980). Due process does not require the jury to be instructed on every non-capital lesser-included offense supported by the evidence. Schad v. Arizona, 501 U.S. 624, 646 (1991). However, a jury may not be placed in "an all-or-nothing position" when the evidence supports a third option. Id.

Whether one state offense is a lesser-included offense of another offense is a question of state law. See Hopkins v. Reeves, 524 U.S. 88, 96-98 & n.6 (1998); Darks v. Mullin, 327 F.3d 1001, 1008 (10th Cir.), cert. denied, 540 U.S. 968 (2003). Under Oklahoma law, "[i]t is the trial court's duty to instruct the jury on all lesser [] offenses that are supported by the evidence, even absent a request from a defendant." Grant v. State, 58 P.3d 783, 795 (Okla. Crim. App. 2002) (citing Shrum, 991 P.2d at 1034), vacated on other grounds, 540 U.S. 801 (2003). The OCCA has adopted an "evidence test [that] considers not only the elements, but [also] looks to the crimes the trial evidence tends to prove." Shrum, 991 P.2d

at 1036.  Thus, "the court is only required to instruct on lesser offenses that are reasonably supported by the evidence."  Grant, 58 P.3d at 795.  The jury is not required "to consider a lesser offense if no jury could rationally find both that the lesser offense was committed and that the greater offense was not."  Frederick v. State, 37 P.3d 908, 943-44 (Okla. Crim. App. 2001).  In other words, "[o]nly if there is evidence which tends to negate an element of [the greater offense], which would reduce the charge," should instructions on a lesser included offense be given.  Fairchild v. State, 998 P.2d 611, 627 (Okla. Crim. App. 1999) (emphasis added)

We must thus consider both the elements of first-degree murder by child abuse and second-degree "depraved mind" and the evidence offered at trial.  The elements of the former offense are: (1) the death of a child under the age of eighteen; (2) resulting from the willful or malicious injuring, torturing, or using of unreasonable force; (3) by the defendant and/or another engaged with the defendant.  Gilson v. State, 8 P.3d 883, 910 (Okla. Crim. App. 2000) (discussing OKLA. STAT tit. 21, § 701.7(C)).[4]  The OCCA has held that first degree child-

---

[4]  OKLA. STAT. tit. 21, § 701.7(C) provides:

A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person . . . .  It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously

(continued...)

-24-

abuse murder is a general intent crime.  See Fairchild, 998 P.2d at 619.  Thus, in order to prove the second element—the "'willful or malicious injuring, torturing, or us[e] of unreasonable force," the prosecution need only prove "a general intent . . . to commit the act which causes the injury."  Id. at 622-23; see also Workman v. Mullin, 342 F.3d 1100, 1110 (10th Cir. 2003) (discussing first-degree murder by child abuse under Oklahoma law and concluding that "the jury need not find that the defendant intended to kill the child . . . but rather the crime is a type of felony murder").

In contrast, the elements of second-degree depraved mind murder in Oklahoma are "(1) [the] death of a human; (2) caused by conduct which was imminently dangerous to another person; (3) the conduct was that of the defendant; (4) the conduct evinced a depraved mind in extreme disregard of human life; (5) the conduct is not done with the intention of taking the life of any particular individual."  Willingham, 947 P.2d at 1081 (emphasis added). The fourth element–the extreme disregard of human life–actually places a higher burden on the prosecution than does the general intent element of first-degree murder by child abuse, which only requires the intent to commit the act of abuse.

As a result, the evidence that Mr. Malicoat invokes to support a second-degree depraved mind murder instruction (his fatigue, stress, and past abuse) does

_____

[4](...continued)
        injured or maimed the child.

not "tend[] to negate an element . . . of the First-Degree [child abuse] Murder statute." Fairchild, 998 P.2d at 627. Although that evidence might be read to suggest that Mr. Malicoat's conduct did not evince a depraved mind in extreme disregard of human life, the evidence does not support the inference that Mr. Malicoat lacked the general intent to assault Tessa—as required to establish first-degree murder by child abuse. Thus, the trial court was not required to instruct the jury on second-degree depraved-mind murder.

That conclusion is supported by our interpretation of the federal murder statutes. In Chanthadara, 230 F.3d at 1257-59, we held that second-degree murder under federal law was not a lesser-included offense of first-degree felony murder under 18 U.S.C § 1111(a). We reasoned that second-degree murder required proof of malice as to the homicide whereas first-degree felony murder only required commission of felonies listed in the statute. Significantly, we relied on a prior decision, Franks v. Alford, 820 F.2d 345, 347 (10th Cir. 1987), in which we held that "'depraved mind' murder [under Oklahoma law] is not a lesser included offense of felony murder because it requires proof of a mental state that felony murder does not."

Accordingly, the OCCA did not unreasonably apply federal law in rejecting Mr. Malicoat's Beck claim.

-26-

## 3. Enmund-Tison challenge

Mr. Malicoat argues that because the jury did not find that he intended to kill Tessa, the imposition of the death penalty violated his Eighth Amendment rights under the principles set forth in Enmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137 (1987). The OCCA rejected this argument on direct appeal, holding that Enmund and Tison are not applicable "when the defendant himself 'personally, willfully, commits an act which produces an injury upon a child resulting in the death of the child, or uses unreasonable force upon a child resulting in the death of the child.'" Malicoat, 992 P.2d at 396 (quoting Fairchild v. State, 992 P.2d 350, 370, opinion on rehearing, 998 P.2d 611 (Okla. Crim. App. 1999)).

The central concern of Enmund and Tison is whether a conviction for felony murder contains an adequate determination of defendants' culpability such that imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. In Enmund, the Supreme Court reversed the death sentence of a defendant who waited outside while his accomplices committed a murder during an armed robbery of a home and subsequently drove the getaway car. The Supreme Court held that because the defendant had not himself killed, attempted to kill, or intended to kill the victims his "degree of participation in the murders was so tangential that it could not be

said to justify a sentence of death." Tison, 481 U.S. at 148 (describing Enmund's ruling) (emphasis in original). The Court has subsequently clarified that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id. at 158.

This circuit has recently rejected an Enmund-Tison challenge arising out of an Oklahoma conviction for first-degree child abuse murder. In Workman, we held that "the constitutional check that Enmund, and certainly that Tison, represent is satisfied in felony murder cases in which the defendant actually killed his victim." 342 F.3d at 1114. Examining the record before us, we noted that the petitioner "was convicted of child abuse murder in which a jury determined that he had actually killed [the victim] . . . [and] was found to have purposefully inflicted the[] blows." Id. at 1114-15.

Workman is applicable here. Like the jury in that case, the jury here found that Mr. Malicoat willfully committed child abuse and that he actually killed Tessa. These findings are sufficient to comport with the Enmund-Tison Eighth Amendment limitations on the application of capital punishment. Accordingly, the OCCA did not unreasonably apply federal law in rejecting Mr. Malicoat's challenge, and he is thus not entitled to relief on this claim.

## 4. Prosecutorial misconduct

Mr. Malicoat next argues that several of the prosecutor's remarks deprived him of a fair trial. The OCCA rejected this claim, concluding that "[a]lthough certain comments were error, and others approached the limits of impermissible argument, we cannot say that the arguments taken as a whole deprived Malicoat of a substantial right or went to the foundation of his defense." Malicoat, 992 P.2d at 401. The court also noted that Mr. Malicoat had not objected to most of the comments, and it thus reviewed those comments for plain error only.

In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, Mr. Malicoat must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case. See Darden, 477 U.S. at 181-82.

Applying those standards, we consider the individual instances of alleged misconduct invoked by Mr. Malicoat.

a. Conducting arguments in the voice of Tessa

The prosecutor conducted a substantial portion of his rebuttal argument in the guilt phase as if he were Tessa. For example, he started the argument by stating "today I want to take you back to February, 1997, because today I'm Tessa Leadford and I live here in Chickasha. That's the man with Mrs. Leadford who gave me life. And that's who I live with." See Tr. Trans. vol. IV, at 42.

Mr. Malicoat objected to this approach, but the trial court overruled the objection. On appeal, the OCCA explained that "[w]hile theatrical, we do not find this argument overly prejudicial." Malicoat, 992 P.2d at 401. The court added that "[t]he argument very nearly constitutes an improper solicitation of sympathy for the victim, but is largely based upon the evidence presented." Id.

Upon review of the record, we conclude that the OCCA did not unreasonably apply federal law in holding that the prosecutor's argument was not sufficiently prejudicial to deprive Mr. Malicoat of a fair trial. As the court observed, the statements made by the prosecutor as to Mr. Malicoat's abusive conduct and the extent of Tessa's injuries are supported by evidence in the record. The prosecution's case was compelling. Thus, Mr. Malicoat is not entitled to relief on this claim of prosecutorial misconduct.

b.  Arguing that it was the jury's civic duty to convict Mr. Malicoat:

Next, Mr. Malicoat challenges the following statements about the jurors' duty:

> You know, you have a great responsibility here. You're doing a civic duty as jurors here, but you're justice in this community.  We told you starting out if you think he's not guilty turn him loose.  That's your duty.  If we haven't proved these material elements to you, turn Mr. Malicoat loose.
>
> By God, that's not what the evidence showed you. The evidence showed you beyond any doubt whatsoever he committed those elements.  And your duty is a double-pronged sword, like we also told you. It's a double-pronged sword.  You have a duty to convict him if we've proven those elements.

Tr. Trans. vol. IV, at 39-40.  Mr. Malicoat did not object to this line of argument.

Mr. Malicoat correctly observes that "[i]t is error for a prosecutor to exhort a jury to reach a guilty verdict based 'on the grounds of civic duty.'"  Spears v. Mullin, 343 F.3d 1215, 1247 (10th Cir. 2003) (quoting Viereck v. United States, 318 U.S. 236, 247-48 (1943)), cert denied sub nom., Powell v. Mullin, 541 U.S. 909 (2004).  However, here, the prosecutor's argument referred to the evidence, stating to the jury that it had a duty to convict if the prosecution had proven the elements.  This is not the same as baldly telling the jury that it had a civic duty to

-31-

convict. Cf. Walker v. Gibson, 228 F.3d 1217, 1242 (10th Cir. 2000) (stating that it was not fundamental error for the prosecutor to tell the jury that it should "do its business"), abrogated on other grounds by Neil v. Gibson, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). Thus the OCCA was not unreasonable in concluding that this argument did not render Mr. Malicoat's trial fundamentally unfair.

c. Calling Mr. Malicoat "a monster"

Mr. Malicoat also challenges the prosecutor's denigrating and degrading comments, particularly his calling Mr. Malicoat "evil" and "a monster." Tr. Trans. vol. V, at 202. Although Mr. Malicoat did not object to these comments at trial, the OCCA concluded that they constituted misconduct under its precedent. See Malicoat, 992 P.2d at 401 (stating that "[t]his Court has repeatedly looked with disfavor on this sort of name-calling and stated prosecutors should refrain from airing their personal opinions"). Nevertheless, the OCCA reasoned, the comments did not constitute plain error.

Here too, the OCCA's analysis was not an unreasonable application of federal law. A prosecutor may not use closing argument to inflame the passions and prejudices of the jury. See United States v. Young, 470 U.S. 1, 8 n.5 (1985) (discussing ABA STANDARDS FOR CRIMINAL JUSTICE 3-5.8 (2d ed. 1980)); United States v. Pena, 930 F.2d 1486, 1490-91 (10th Cir. 1991) (concluding that a

-32-

prosecutor's argument was improper because "it was calculated to inflame the jury's passions" by implying that the defendant had committed another crime). The prosecutor's name-calling was an attempt to do so. Nevertheless, the OCCA's conclusion is supported by the strength of the state's case and the fact that the majority of the prosecutor's argument was based upon evidence in the record. See Young, 470 U.S. at 16 (concluding that "the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"); see also Rojem v. Gibson, 245 F.3d 1130, 1143 (10th Cir. 2001) (concluding that "[i]n light of the considerable evidence supporting guilt and the aggravating factors, the prosecutor's comments did not influence the jury's verdict").

#### d. Demeaning the mitigating evidence offered by Mr. Malicoat

Mr. Malicoat argues that it was improper for the prosecutor to demean the mitigating evidence that he presented. He notes that, in closing argument, the prosecutor stated that "[Mr. Malicoat's attorney] told you in his opening we're not here to talk about excuses. He said no excuses. These mitigators—that's what these mitigators are. They're excuses." Tr. Trans. vol. V, at 206.

Mr. Malicoat did not object at trial. On direct appeal, the OCCA concluded that this line of argument was not improper. The court reasoned that the

-33-

"characterization of Malicoat's mitigating evidence as an attempt to blame his family for the cycle of child abuse, which resulted in Tessa's death, is a reasonable inference from the evidence."  Malicoat, 992 P.2d at 401-02.

Again, we conclude that the OCCA did not unreasonably apply federal law. A prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.  See Buchanan v. Angelone, 522 U.S. 269, 279 (1998) (stating that "the extensive arguments of both defense counsel and the prosecutor on the mitigating evidence and the effect it should be given in the sentencing determination" indicated that the jury had considered that evidence); see also Walker, 228 F.3d at 1243 ("[A] prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors.") Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir. 2000) (rejecting an allegation of misconduct when "the prosecutor merely commented on the weight that should be accorded to the mitigating factors" and "did not suggest that the jury was not permitted to consider the factors").

e. Expressing a personal opinion about the death penalty

Mr. Malicoat argues that the prosecutor improperly expressed his personal beliefs about the death penalty.  Mr. Malicoat cites the prosecutor's statements that "[t]here's a place in our system for the death penalty," "[i]t is proper punishment," "[t]his is the time," "[t]he only just verdict this case warrants the

-34-

death penalty," and that "[w]e need you to do it for Tessa." Tr. Trans. vol. V, at 203, 211. He points out that the prosecutor also asked "What kind of crime besides the torture of a 13-month-old is a proper crime for the death penalty? What justifies it more than this crime?" Id. at 203.

Mr. Malicoat did not object to this line of argument at trial. On direct appeal, the OCCA noted that it had "repeatedly warned prosecutors not to engage in these specific arguments or express personal opinions about the appropriateness of the death penalty." Malicoat, 992 P.2d at 402. However, the court further concluded, these "'improper and reprehensible comments' did not deprive Malicoat of a substantial right or go to the foundation of his defense." Id. (quoting Harjo v. State, 882 P.2d at 1067, 1076 (Okla. Crim. App. 1994)).

Again, the OCCA's ruling was not unreasonable. "'Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.'" Young, 470 U.S. at 8 n.5 (quoting ABA STANDARDS FOR CRIMINAL JUSTICE 3-5.8); see also Le v. Mullin, 311 F.3d 1002, 1021 (10th Cir. 2002) (concluding that a prosecutor's statement that the jury "could only do justice in this case by bringing in a verdict of death" constituted misconduct) (internal quotation marks and alternations omitted). However, we have further concluded that, in light of

-35-

overwhelming evidence of a defendant's guilt, evidence of aggravating factors supporting a death sentence, and the general content of the instructions to the jury, such comments do not necessarily deprive a defendant of a fair trial. See Le, 311 F.3d at 1021. Here, these factors support the OCCA's conclusion that the prosecutor's improper comments did not deprive Mr. Malicoat of a fair trial.

### f. Arguing facts not in evidence to play to the jury's sympathy

Finally, Mr. Malicoat challenges the prosecutor's argument that Tessa was named after a character in the television show "Touched by an Angel." He points out that this fact was not put into evidence. Again, Mr. Malicoat did not object to this argument at trial. On direct appeal, the OCCA concluded that the argument did not deprive Mr. Malicoat of a substantial right or go to the foundation of his defense. Malicoat, 992 P.2d at 402.

Again, the OCCA did not unreasonably apply federal law. "'It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.'" Young, 470 U.S. at 9 n.7 (quoting ABA STANDARD FOR CRIMINAL JUSTICE 4-7.8); see also Jones, 194 F.3d at 1181 ("A prosecutor engages in misconduct when he refers to matters outside the record."). The state does not dispute that the prosecutor engaged in such misconduct here, since there was no testimony in the record about the origin of

-36-

Tessa's name. However, we note that the trial court instructed the jury to decide the case on the basis of the evidence presented. See State Ct. Rec. vol. I, at 329 (informing the jury that it "should consider only the evidence introduced while the Court is in session"). The strength of the prosecution's case and the fact that the jury was properly instructed support the OCCA's decision. Cf. United States v. Ramirez, 63 F.3d 937, 944-45 (10th Cir. 1995) (holding that prosecutorial misconduct did not warrant reversal because, inter alia, the court instructed the jury to decide the case based on the evidence presented).

### g. Cumulative effect of prosecutor's statements

Finally, we have also considered the cumulative effect of the incidents of misconduct set forth above. See Walker, 228 F.3d at 1243 (considering prosecutor's comments, individually and cumulatively). Again, the strength of the prosecution's case, presented to a properly instructed jury, establishes that the cumulative effect of this misconduct did not deprive Mr. Malicoat of a fair trial.

### 5. Admission of Tessa's photograph

Mr. Malicoat argues that the state trial court erred in admitting a photograph of Tessa taken approximately two months before her murder. The

trial court admitted the photograph in the sentencing phase, during the prosecutor's cross-examination of Mr. Malicoat's brother Hugh. The prosecutor then referred to the photograph in closing argument, stating that "Tessa Leadford went from being a beautiful, blonde-haired girl with beautiful blue eyes, puppy dog eyes, as [Mr. Malicoat] called it." Tr. Trans. vol. V, at 210.

Mr. Malicoat objected to admission of the photograph, but the trial court overruled his objection. On direct appeal, the OCCA noted that "[p]hotographs of live victims are generally inadmissible, as they are irrelevant to any issues at trial." Malicoat, 992 P.2d at 404. The court held that the photograph of Tessa was irrelevant and should not have been admitted and that the prosecution's reference to it in closing argument compounded the error. Nevertheless, the OCCA concluded beyond a reasonable doubt that the picture did not contribute to Mr. Malicoat's death sentence.

Under Chapman v. California, 386 U.S. 18, 24 (1967), a constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Here, in light of the evidence offered by the prosecution in support of the aggravating circumstances, we conclude that the OCCA's holding was not an unreasonable application of Chapman's federal harmless error standard. See Spears, 343 F.3d at 1233 n.14 (stating that when "there is a state-court-Chapman determination to defer to under 28 U.S.C. §

2254(d)," the court must decide "whether the state court's finding of harmless error was contrary to or an unreasonable application of <u>Chapman</u>").

The jury heard ample evidence in support of the aggravating circumstances urged by the prosecution in support of the death penalty. The OCCA's conclusion that the single living photograph of Tessa "did not contribute to Malicoat's death sentence," <u>Malicoat</u>, 992 P.2d at 404, is a plausible reading of the record. Thus, Mr. Malicoat is not entitled to relief on this claim.

6. Ineffective assistance of trial counsel

Mr. Malicoat next argues that he received ineffective assistance of counsel at trial. According to Mr. Malicoat, his trial counsel was ineffective because he: (1) did not give an opening statement in the guilt phase; (2) failed to present evidence from a psychologist, Dr. Phillip Murphy, that Mr. Malicoat did not have the intent to injure or kill; (3) failed to conduct an adequate mental health investigation by failing to ask Mr. Malicoat's family about his history of seizures.

The first of these alleged deficiencies resulted in part from the trial court's ruling that Mr. Malicoat's counsel would not be allowed to present an opening statement until the close of the prosecution's case. Mr. Malicoat's counsel objected to this restriction, but his objection was overruled. Then, when the time

came for the defense's opening statement, Mr. Malicoat's counsel did not give one. He also chose not to put on any defense evidence during the guilt phase.

As to testimony from the psychologist, the record indicates that, at the close of the prosecution's case, Mr. Malicoat's counsel informed the trial judge that he intended to call Dr. Murphy on the following day as the first witness for the defense. According to Mr. Malicoat's trial counsel, Dr. Murphy had written a report that stated that Mr. Malicoat was "misreading the reality of [his punches to Tessa's stomach] and the effect that [they] would have on someone so small which led to the homicide." Tr. Trans. vol. III, at 285. Thus, "Dr. Murphy's report indicated Mr. Malicoat was intending to discipline his daughter and not kill her." Aplt's Br. at 54-55. However, on the following day, Mr. Malicoat's counsel announced that he would be presenting no evidence during the guilt phase.

As to the third alleged instance of ineffective assistance of counsel, Mr. Malicoat reports that interviews with his family members indicated that he had a long history of seizures. According to Mr. Malicoat, this information would have supported a conviction on the lesser offense of second-degree depraved-mind murder and would also have been powerful mitigating evidence if it had been presented at sentencing. Mr. Malicoat asserts that trial counsel was deficient for failing to unearth this mental health evidence and that there is a reasonable

probability that the jury's verdict would have been different had this evidence been presented. Id. at 59. He adds that the federal district court should have granted his request for an evidentiary hearing because there are factual disputes as to his mental health history and its effect on the offense.

On direct appeal, the OCCA rejected Mr. Malicoat's claim of ineffective assistance of counsel. As to the failure to present an opening statement, the OCCA characterized Mr. Malicoat's counsel's action as a strategic decision. As to Dr. Murphy's testimony, the OCCA noted that first-degree child abuse murder is a general intent crime and that, as a result, the testimony about Mr. Malicoat's lack of intent to kill or injure would have been irrelevant in the guilt phase of the trial. Thus, Mr. Malicoat's attorney was not ineffective for declining to present it. Finally, as to Mr. Malicoat's history of seizures, the OCCA observed that his counsel had presented at sentencing "a thorough and comprehensive picture of Malicoat's personal and family history, concentrating on his experience of severe abuse and resulting personality transformation." Malicoat, 992 P.2d at 406. In light of all of this evidence, Mr. Malicoat had not shown that the additional evidence that he suffered from seizures "would have led the jury to conclude [that] the balance of aggravating circumstances and mitigating factors did not support death." Id.

In rejecting Mr. Malicoat's claim for ineffective assistance of trial counsel, the OCCA relied in part on the standard set forth in Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). The OCCA stated that "[t]he question [in determining whether Mr. Malicoat was prejudiced by his trial counsel's errors] is not whether the outcome would have been different absent counsel's actions but whether the result of the proceeding was fundamentally unfair or unreliable." Malicoat, 992 P.2d at 405. As Mr. Malicoat argues, this is not the correct standard. In particular, as the Supreme Court explained in Williams v. Taylor, 529 U.S. 362, 392-93 (2000), the Lockhart "fundamentally unfair" inquiry is used to supplement the ordinary prejudice inquiry under Strickland only when the law has changed after counsel's allegedly deficient performance. See also Lockhart, 506 U.S. at 373 (O'Connor, J., concurring) (stating that the majority opinion "will, in the vast majority of cases, have no effect on the prejudice inquiry under [Strickland]").

Because the OCCA applied the incorrect standard, we do not defer to its analysis of this claim. See Spears, 343 F.3d at 1248 (concluding that, because the OCCA had "applied Strickland, but as further restricted by Lockhart," the OCCA's ruling was not entitled to deference under AEDPA). Instead, we examine the claim de novo, applying the familiar two-part standard set forth in Strickland and asking whether Mr. Malicoat's counsel's performance was deficient, and if so, whether counsel's deficient performance actually prejudiced

-42-

Mr. Malicoat's defense. United States v. Harms, 371 F.3d 1208, 1211 (10th Cir. 2004) (discussing Strickland).

a. Failure to give an opening statement

As to Mr. Malicoat's counsel's failure to give an opening statement during the guilt phase, we note that, under the first Strickland inquiry—whether counsel engaged in deficient performance—we must "impose a heavy presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance; that is, . . . the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" United States v. Aptt, 354 F.3d 1269, 1284 (10th Cir. 2004) (quoting Strickland, 466 U.S. at 689).

Here, affording Mr. Malicoat's counsel the benefit of that presumption, his decision to waive his opening statement appears sound. During the guilt phase, the prosecution's evidence was overwhelming, and there was little dispute as to the relevant facts. Moreover, because first-degree murder by child abuse is a general intent crime in Oklahoma, there is little indication that Mr. Malicoat had a plausible defense to offer. Thus, his counsel might reasonably have concluded that, in order be more persuasive to the jury at sentencing, it was preferable to refrain from making a fruitless opening statement during the guilt phase. See Fox, 200 F.3d at 1296 ("While opening and closing statements are not to be

lightly waived in a capital case, it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel"); Parker v. Head, 244 F.3d 831, 840 (11th Cir. 2001) (finding reasonable a state court's conclusion that counsel's concession during the guilt phase closing argument was "a strategic decision made . . . in order to maintain credibility with the jury for sentencing purposes"). Accordingly, we conclude that Mr. Malicoat's counsel's waiver of opening statement did not constitute deficient performance.

### b. Failure to introduce psychological testimony during the guilt phase

As to counsel's failure to introduce testimony from Dr. Murphy during the guilt phase, we agree with the OCCA that Mr. Malicoat's argument is undermined by the fact that, in Oklahoma, first-degree murder by child abuse is a general intent crime. Accordingly, the prosecution was not required to prove that Mr. Malicoat intended to kill or injure Tessa but only that he intended to commit the abusive act. See Fairchild, 998 P.2d at 622-23. Thus, Dr. Murphy's statement about the effects that Mr. Malicoat anticipated from his abuse of Tessa (i.e., that Mr. Malicoat "was misreading the reality of [his] punches to the stomach and the effect that such would have on someone so small," Tr. Trans. vol. III, at 285), could not have provided a colorable defense to the first-degree murder charge.

-44-

Accordingly, Mr. Malicoat's counsel did not provide deficient performance by failing to offer Dr. Murphy's testimony during the guilt phase.

### c. Failure to investigate Mr. Malicoat's history of seizures

As to the failure to investigate Mr. Malicoat's history of seizures, we conclude that Mr. Malicoat has failed to establish that this evidence, if discovered by his counsel and presented to the jury, "might well have influenced the jury's appraisal of [his] culpability." Rompilla v. Beard, 125 S. Ct. 2456, 2469 (2005) (internal quotation marks and citations omitted). The record does indicate that Mr. Malicoat's attorney did present to the jury at sentencing fairly extensive evidence about the abuse that Mr. Malicoat had suffered as a child. There is no indication that additional evidence of Mr. Malicoat's mental health history would have affected the jury's imposition of the death penalty.

Accordingly, as to this claim of ineffective assistance of counsel, Mr. Malicoat has failed to establish the required element of prejudice.

### 7. Cumulative error

Finally, Mr. Malicoat argues that the cumulative effect of various errors deprived him of a fair trial: (1) the admission of the photograph taken of Tessa

-45-

when she was alive; (2) the testimony of Mr. Malicoat's estranged wife that he failed to pay child support; (3) the testimony of a social worker that the social worker believed that Mr. Malicoat had intentionally abused Tessa; (4) the prosecutor's statement in closing argument that Tessa was named after an angel in a television show; and (5) testimony that Mr. Malicoat's home was unclean and that the refrigerator was not stocked with food appropriate for a thirteen-month old child. Mr. Malicoat notes that the OCCA found error in the first four instances but further concluded that the errors were not sufficiently prejudicial to warrant a new trial. He now asserts that the cumulative effect of these errors establishes that his conviction and sentence should be overturned.

As to this claim, the parties disagree regarding the proper standard of review. According to Mr. Malicoat, the OCCA did not apply the controlling federal standard regarding cumulative error and, as a result, the OCCA's rejection of his cumulative error claim is entitled to no deference. In support of this contention, Mr. Malicoat notes that the OCCA rejected his cumulative error argument in fairly cursory terms:

> Malicoat claims he is entitled to relief due to the accumulation of error in the case. Malicoat has raised no issue which individually or in accumulation requires relief. We have determined that any individual errors were either cured or did not affect a substantial right or go to the foundation of Malicoat's defense. There is no cumulative error, and this proposition is denied.

Malicoat, 992 P.2d at 406.  As Mr. Malicoat reads this passage, the OCCA concluded that because none of the individual errors was prejudicial, the cumulative effect of these individual errors was necessarily not prejudicial either. Mr. Malicoat notes that this reading of the cumulative error doctrine is incorrect. See Cargle v. Mullin, 317 F.3d 1196, 1207 (10th Cir. 2003) (explaining that "to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice would render the cumulative error inquiry meaningless, since it [would] . . . be predicated predicated only upon individual error already requiring reversal") (internal quotation marks omitted).

In response, the state contests this reading of the OCCA's opinion.  The state contends that the OCCA's application of the cumulative error doctrine comported with the federal standard and that the OCCA did assess the collective impact of the individual errors.  It invokes this court's decision in Miller v. Mullin, 354 F.3d 1288, 1301 (10th Cir. 2004).  There, we applied the deferential AEDPA standard of review to the OCCA's ruling on the petitioner's cumulative error claim.  See id. (discussing the OCCA's ruling in Miller v. State, 977 P.2d 1099, 1114 (Okla. Crim. App. 1998)).  According to the state, the OCCA's ruling on the cumulative error claim in Miller resembles its ruling on the cumulative

-47-

error claim at issue here, and, as a result, AEDPA deference is warranted in this case as well.

Unlike the state, we see an arguable difference between the OCCA's rulings in Miller and in Mr. Malicoat's case. In Miller, the OCCA identified four individual errors that it had found and then concluded that the individual errors "gather no force in aggregate" and "gain no weight in aggregate." 977 P.2d at 1114. That language establishes that the OCCA independently considered the aggregate effect of the individual errors, as required by federal law. In contrast, the OCCA's opinion in Mr. Malicoat's case can be reasonably read to suggest that, because "any individual errors were either cured or did not affect a substantial right or go to the foundation of Malicoat's defense," Malicoat, 992 P.2d at 405, there was necessarily no cumulative error. Thus, the OCCA's opinion does not clearly indicate that it considered, in the aggregate, the prejudicial effect of the individual errors. Accordingly, as to the standard of review, we afford Mr. Malicoat the benefit of the doubt and review his cumulative error claim de novo.

Nevertheless, even under the de novo standard, we conclude that Mr. Malicoat has not demonstrated that the cumulative effect of the individual errors deprived him of a fair trial. The prosecution's evidence during the guilt phase was overwhelming, and, in light of that evidence, we see no indication that the

evidentiary errors and instances of prosecutorial misconduct affected the jury's decision. The evidence offered by the prosecution at sentencing was also quite strong. Given the extent of Tessa's injuries, her young age, the pattern of abuse, and Mr. Malicoat's conduct after inflicting the fatal blows, Mr. Malicoat has failed to establish that these errors had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (internal quotation marks omitted).

### III. CONCLUSION

Accordingly, for the reasons set forth above, we AFFIRM the district court's decision denying Mr. Malicoat's 28 U.S.C. § 2254 petition for a writ of habeas corpus.



