Filed 12/31/24  P. v. Gonzalez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B328911 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA117722) |
| v. | |
| RAYMOND GONZALEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Juan C. Dominguez, Judge.  Affirmed.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Raymond Gonzalez (defendant) guilty of carjacking and the premeditated murders of Robert Ryan, Jr. (Ryan) and Jacob Dominguez (Dominguez). We are asked to decide many issues: whether the trial court had jurisdiction to reconsider an order dismissing special circumstance allegations, whether the court should have dismissed or inquired further of jurors who were potentially aware of plea negotiations, whether the court erred in admitting a recording of a witness interview that included investigators' statements regarding defendant's culpability, whether the court should have instructed the jury to view accomplice testimony with caution, whether the prosecution's reference to defendant as a "monster" violated the Racial Justice Act, and whether the prosecution improperly vouched for the credibility of a witness during closing argument.

## I. BACKGROUND

### A. *The Offense Conduct, as Established by the Evidence at Trial*

Ryan left home on December 11, 2017, with an insurance check for over $4,000. Ryan's father, Robert Ryan, Sr., was "very concerned" that his son had the check because Ryan struggled with substance abuse.

Ryan arrived at a check cashing business in Covina shortly after 4:00 p.m. and left with $4,132 in cash. He was accompanied by his friend, Dominguez. Later that afternoon, the two men took an Uber from Covina to El Monte. Their driver, Jose Murillo (Murillo), testified he took them to their destination—a shopping center—and agreed to wait while Ryan stepped out of the car for

2

a few minutes. Ryan and Dominguez then offered Murillo cash to drive them to a second destination in Baldwin Park.

Surveillance video from a neighboring residence captured Murillo's white Toyota Yaris arriving at a house on Cosbey Street in Baldwin Park around 5:25 p.m. Murillo testified Ryan searched his pockets for a $20 bill to pay for the ride by first removing a "wad" of cash from one pocket and then pulling "another wad of money" out of a different pocket because the first group of bills "was all hundreds."

The house on Cosbey Street was owned by relatives of Eduardo Rodriguez (Rodriguez). He sold drugs out of the house and allowed various friends to live with him on a temporary basis. Rodriguez believed the home could be described as a "trap house," meaning "[a] place [where] people get high and sell drugs and . . . [¶] . . . [¶] [h]ang out."

As of December 2017, the other residents of the Cosbey house included Rodriguez's significant other, Selena Garcia (Garcia), a 17-year-old named Jasmin Torres (Torres), and defendant, who was known by the moniker "Danger." Also present on the day Ryan and Dominguez arrived at the Cosbey house were Adrian Mora (Mora) and Sabino Delgado (Delgado).[1]

Delgado worked as an auto mechanic. A mutual friend called "Pest" recommended Delgado to Rodriguez, and Rodriguez hired him to come to the Cosbey residence to work on his car. Delgado saw "an older white man and . . . a younger Hispanic man" (descriptions matching Ryan and Dominguez) enter the garage where he was working, talk with Rodriguez, and go inside the house. Delgado later saw Rodriguez leave with others in a

---

[1]     Mora died in 2018.

truck.  Sometime after that, Delgado asked a person resembling defendant for a key to a gate so he could retrieve a tool from his car parked outside.

Delgado was still working in the garage when he heard several gunshots in rapid succession from inside the house.  He grabbed his tools, climbed over a fence, went to his car, and drove away.  Surveillance video from the neighbor's house showed Delgado leaving around 6:32 p.m.  Other, unidentified individuals can also be seen in the garage and on the driveway.  As he drove away, Delgado called Pest and told him about the shooting.

Rodriguez was at a friend's house when Pest called to tell him "something bad" had happened at the Cosbey house.  As we shall discuss in more detail, the trial court during defendant's later criminal trial allowed the prosecution to play a recording of a February 2018 interview of Rodriguez that investigators conducted while he was in custody on an unrelated matter.  Among other things, Rodriguez stated during the interview that, after he spoke with Pest, his father dropped him off at a house in Azusa, defendant then called Rodriguez and said he needed help, Rodriguez said he would not help but had a friend drive him back to the Cosbey house, Rodriguez saw a foot extending from beneath a curtain when he arrived and asked defendant, "What the fuck?," and defendant replied, "I did it, my boy."  Rodriguez was angry and shoved defendant because Ryan had been his "best friend."

Around midnight that same night, Maria Juarez (Juarez) went outside her home one block away from the Cosbey residence to check that her van was locked.  Defendant approached, pointed a silver handgun at her, and demanded the keys to the van.  Juarez testified she knew defendant, who was an acquaintance of

4

her son, and initially refused to hand over the keys. She relented, however, because defendant had the gun pointed at her face and he seemed "serious."

Juarez did not report the theft of her van to police because she believed defendant would hurt her or her family if she did not keep quiet. Instead, Juarez told Rodriguez she needed her van back. Rodriguez gave Juarez defendant's phone number, and she called him. Defendant returned the van several days later in a dirty and damaged condition, with a bad odor and blood stains inside. Stephanie Sandoval (Sandoval), a criminalist employed by the Los Angeles County Sheriff's Department, found Ryan was a major contributor of DNA to several blood stains found inside the van and Dominguez was a possible minor contributor to one.

Surveillance video from Rodriguez's neighbor on Cosbey Street showed Juarez's van backing into Rodriguez's garage shortly before 1:00 a.m. Around 8:40 a.m., the garage door opened and the van drove away.

Michael Easter (Easter), a special agent with the FBI's cellular analysis survey team, performed a historical cell site analysis for the phone number Juarez called to speak with defendant. Easter testified the phone was near the Cosbey residence and Juarez's house on the evening of December 11, 2017, and moved east along Interstate 10 toward Redlands beginning around 9:00 a.m. the next morning. The phone was in Victorville around noon.

Ryan and Dominguez's bodies were discovered in a field near a hospital in Victorville on December 17, 2017. Defendant was a major contributor of DNA recovered from the inside of a glove found among debris scattered near the bodies. Ryan and Dominguez were wearing the same clothes seen in surveillance

5

video from the check cashing business. Ryan no longer had any cash in his pockets. Curtains found near the bodies matched the pattern of curtains seen in a video of a December 15, 2017, search of the Cosbey residence unrelated to this case. When investigators searched the house again in February 2018, tiles had been removed and the floor painted in the room where Rodgriguez told investigators defendant slept.

Ryan died of multiple gunshot wounds, including to his head, chest, back, and arm. Dominguez died of a single gunshot to his head. An autopsy revealed both men consumed various drugs shortly before they were killed.

### B. Verdict and Sentencing

Defendant was charged with two counts of murder (counts one and two) and one count of carjacking (count three). In connection with the murder counts, the information alleged firearm enhancements (Pen. Code,[2] § 12022.53, subds. (b)-(d)) and two special circumstances: commission of multiple murders (§ 190.2, subd. (a)(3)) and commission of murder during a robbery (§ 190.2, subd. (a)(17)).[3] As we shall discuss in more detail, the trial court initially dismissed the special circumstance allegations but subsequently reconsidered and vacated that ruling before trial.

---

[2] Undesignated statutory references that follow are to the Penal Code.

[3] A personal use of a firearm enhancement was also alleged in connection with the carjacking charge. Trial of additional alleged gang enhancements was bifurcated, and those enhancements were ultimately dismissed.

6

A jury convicted defendant on all three charged crimes and found all associated special circumstances and firearm enhancements true. The trial court sentenced defendant to two consecutive terms of life without the possibility of parole on the murder counts, plus a consecutive term of 50 years to life for the associated section 12022.53, subdivision (d) enhancements. As to the carjacking count, the trial court sentenced defendant to the mid-term of five years plus a consecutive term of 10 years for the section 12022.53, subdivision (b) enhancement.

## II.  DISCUSSION

Defendant's various assignments of error do not warrant reversal. We first summarize why and then explain in greater detail.

Before trial, the prosecution moved to dismiss the special circumstance allegations it had earlier alleged. The trial court first granted that motion, believing it was obligated to do so by "the notion of separation of powers." The court later reconsidered that ruling on its own motion, however, reasoning it had not applied the correct legal standard. The court accordingly vacated its earlier dismissal order, which reinstated the special circumstance allegations for trial. Defendant contends this was error because the trial court had no jurisdiction to reconsider its initial ruling and its reinstatement of the special circumstance allegations violated separation of powers principles. We hold to the contrary. The trial court was entitled to reconsider its pre-trial dismissal order and it did not usurp the prosecution's role in doing so.

Defendant also challenges the trial court's handling of jurors' exposure to information regarding plea negotiations. One

7

juror disclosed to the trial court that he overheard someone outside the courtroom say defendant had not accepted a plea deal and, separately, a judicial officer told all prospective jurors prior to voir dire that the matter was delayed because "'[w]e're trying to see if we can avoid a trial.'" We conclude the trial court adequately investigated whether the juror making these disclosures could be impartial, correctly determined he could be, and acted within its discretion in declining to question other jurors.

Defendant forfeited his challenge to the trial court's admission of portions of Rodriguez's recorded interview in which investigators asserted they knew defendant was the killer because no contemporaneous objection was made. There is no basis in the appellate record to say the absence of an objection constitutes ineffective assistance of counsel because defendant's attorney may have decided to refrain from objecting because the manner in which the investigators questioned Rodriguez during the interview undermined the reliability of his statements.

Assuming the trial court erred in failing to instruct the jury that it should consider whether Rodriguez was an accomplice and, if so, that it should view his testimony and statements implicating defendant with caution, the error was still harmless. The jury received other instructions highlighting relevant considerations in assessing Rodriguez's credibility, especially concerning defendant's statements to Rodriguez.

Defendant further contends the prosecution's characterization of him as a "monster" during closing argument violated the Racial Justice Act. The issue is forfeited, but the argument lacks merit in any case because the word "monster,"

8

without more, does not constitute "racially discriminatory language" under section 745, subdivision (h)(4).

Defendant also forfeited his argument that the prosecution engaged in misconduct during closing argument by suggesting "truth" and "justice" demanded the prosecution call Rodriguez to testify as a witness even though that may put Rodriguez in danger. Defendant's attorney was not ineffective in failing to object because he may have determined Rodriguez appeared genuinely fearful and it was best not to draw further attention to the point.

### A. *The Trial Court Had Jurisdiction to Reconsider Its Order Dismissing the Special Circumstance Allegations and Did Not Violate Separation of Powers Principles*

#### 1. *Additional background*

Before trial, the prosecution moved to dismiss all enhancements and the special circumstance allegations pursuant to section 1385. The motion, based on special directives issued by the then newly-elected Los Angeles County District Attorney, did not make a case-specific argument for why dismissal was in furtherance of justice.[4]

---

[4] The deputy district attorney who filed the motion stated at the hearing on the motion that, "based on [his] education, [his] law training, and experience as a district attorney, . . . there was more than sufficient evidence to prove . . . defendant guilty beyond a reasonable doubt and for a jury to find beyond a reasonable doubt that the special circumstances, the gun enhancements, and the gang enhancements" were true.

9

At a January 2021 hearing, the trial court granted the motion as to the special circumstance allegations but deferred making a final ruling on the firearm enhancements until sentencing. The trial court remarked on the record that "the motion [could not] be possibly supported by the law or the evidence in this case" and observed the prosecution was "not asking the court to dismiss based on the law, the facts, the evidence in this case, or the pain and suffering of the victims' families. [¶] Instead[,] it wishe[d] the court to dismiss based upon the notion of separation of powers and the discretion of the District Attorney to choose which charges and allegations it wishe[d] to proceed on in the case." The court stated it was granting the motion "[f]or that reason alone." The court explained that "while [it] [did] not personally agree with the special directives that apply in this case, [its] personal view [was] not relevant, and [it] must honor the separation of powers and the absolute discretion of the [District Attorney] or the [District Attorney's] office in making this motion."

Ryan and Dominguez's families filed a motion for reconsideration of the trial court's ruling. On its own motion, the trial court asked the parties to be prepared at a future hearing to discuss "whether or not the victims' families ha[d] standing to ask the court for reconsideration of its dismissal order" and "whether or not the court ha[d] the authority on its own motion to reconsider its dismissal order." Further, assuming the trial court had authority to reconsider the order, the trial court asked the parties to address whether the motion to dismiss should be granted in furtherance of justice.

At a hearing in May 2021, defendant argued that although the trial court has broad jurisdiction to reconsider interim orders,

10

it lacked jurisdiction to reconsider what the defense believed was a *final* order dismissing the enhancements. Defendant further argued that reinstating the special circumstance allegations would violate separation of powers principles because "the court would be acting as a prosecutor in determining which special circumstance should be added back on." The prosecution confined itself to "simply stat[ing] what [it] believe[d] the law to be" because "the court . . . asked for the People's input . . . ." The prosecution opined the trial court retained jurisdiction to correct a legal error—e.g., failing to consider the interest of justice in granting the motion to dismiss.

After hearing from counsel, the trial court issued an order vacating its prior dismissal order, which reinstated the special circumstance allegations. Relying on determinations that it "erroneously applied the separation of powers doctrine when it should have determined whether dismissal was 'in furtherance of justice,'" that the case "remain[ed] in pre-trial status with no trial date scheduled," and that reinstating the special circumstance allegations would "place[ ] the parties in the same position they were in before the January . . . hearing," the court found it could "reconsider whether the policy considerations set forth in the Special Directives provide a legal basis for the court to conclude that dismissal of the special circumstance and sentence enhancement allegations is in furtherance of justice . . . ." The trial court concluded dismissal would not be in furtherance of justice based on the offense conduct and the lack of "mitigating facts or personal circumstances of the defendant to support the dismissal motion."[5]

---

[5] Defendant challenged this order in a petition for writ of mandate, and the District Attorney filed a letter in support of the

11

## 2. *Jurisdiction*

"Generally speaking, courts may correct judicial error in the making of interim orders or in limine rulings until pronouncement or entry of a judgment. [Citations.] On the other hand, judicial error in the making of a final order or judgment 'may not be corrected except pursuant to statutory procedures' or on the limited grounds available for a collateral attack. [Citations.]"[6] (*People v. Delouize* (2004) 32 Cal.4th 1223, 1231, fn. omitted.)

In *DeLouize*, our Supreme Court considered whether a trial court may reconsider an order granting a criminal defendant a

petition. This court denied the petition, reasoning defendant had an adequate remedy by way of appeal after judgment. On petition for review, our Supreme Court transferred the matter to this court with directions to vacate the order denying mandate and to issue an order to show cause why relief should not be granted. The District Attorney again filed a letter in support of the petition. This court again denied the petition, explaining, "[W]e remain of the view that there exists an adequate remedy by way of appeal after any adverse final judgment such that extraordinary writ relief should be denied." (*Gonzalez v. Superior Court* (Apr. 7, 2022, B313730) [nonpub. opn.].) Another petition for review of that opinion was filed in our Supreme Court and that review petition was denied.

[6] Because there is no dispute that the trial court sought to correct a judicial error, the issue here is whether the trial court's January 2021 order was an interim order or a final order. Defendant's discussion of *Smith v. Superior Court* (1981) 115 Cal.App.3d 285, which held that an order's impact on a criminal defendant's substantial rights bears on the distinction between judicial error and clerical error, is not relevant to our analysis.

12

new trial after the time for the prosecution to appeal the order has expired. (*DeLouize*, *supra*, 32 Cal.4th at 1226.) Eschewing "appealability as a test for distinguishing final orders from interim orders," the Court held the issue should be analyzed "in terms of the policies underlying the general concept of finality. Orders and judgments are deemed final in the superior court, and not subject to reconsideration by that court, to preserve confidence in the integrity of judicial procedures and to avoid the delays and inefficiencies associated with repeated examination and relitigation of the same facts and issues. [Citation.] The concept of finality 'rests upon the sound policy of limiting litigation by preventing a party who has had one fair adversary hearing on an issue from again drawing it into controversy and subjecting the other party to further expense in its reexamination.' [Citations.]" (*Id.* at 1232.) The Supreme Court held an order granting a new trial is an interim order subject to reconsideration because, among other things, "[t]he time required to reconsider an order granting a new trial is brief in relation to the duration of a new criminal trial." (*Ibid.*) The trial court's reconsideration of an erroneously granted new trial motion "promotes confidence in the judicial system, conserves judicial resources, and spares the parties from the inconvenience and expense of a second trial." (*Ibid.*)

Here, the trial court's sua sponte reconsideration of its own pre-trial ruling, with no need for further fact development, does not offend "'the sound policy of limiting litigation by preventing a party who has had one fair adversary hearing on an issue'" from raising it again. (*DeLouize*, *supra*, 32 Cal.4th at 1232; *People v. Nesbitt* (2010) 191 Cal.App.4th 227, 243 [holding that the trial court did not err in reconsidering a prior order where doing so

13

"did not involve the delay or inefficiencies associated with repeated examination and relitigation of the same facts and issues"].) Moreover, the trial court's correction of an undisputed error—defendant does not dispute the trial court applied the wrong legal standard in its January 2021 ruling—promotes confidence in the judicial system.

Citing *DeLouize*, however, defendant contends the prosecution's failure to timely appeal the January 2021 order weighs in favor of its finality. *DeLouize* explained that "[a] party's failure to file a timely appeal from an appealable order generally shows acquiescence in the ruling" and "may bar a later motion in the trial court seeking reconsideration of the ruling." (*DeLouize, supra,* 32 Cal.4th at 1232-1233.) Here, the prosecution's "acquiescence" in a ruling *granting* its motion is both unremarkable and immaterial because it was not the prosecution that sought reconsideration.

Defendant's further contention that the January 2021 order must be deemed final because it preserved "judicial and public resources" by "narrowing or eliminating major issues" also lacks merit. As pertinent to this appeal, all the same evidence (commission of multiple murders and commission of murder while engaged in robbery) would have been presented at trial regardless of whether the special circumstances were dismissed or reinstated.

The trial court's January 2021 dismissal order is therefore properly considered an interim order based on the policy factors identified in *DeLouize* and the trial court accordingly had jurisdiction to reconsider its ruling.

14

### 3. *Separation of powers*

"The California Constitution (art. III, § 3) provides that '[t]he powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' [¶] It is well settled that the prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring. [Citations.] This prosecutorial discretion to choose, for each particular case, the actual charges from among those potentially available arises from "'the complex considerations necessary for the effective and efficient administration of law enforcement.'" [Citation.] The prosecution's authority in this regard is founded, among other things, on the principle of separation of powers, and generally is not subject to supervision by the judicial branch. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 134.)

Defendant contends the trial court's May 2021 order vacating its earlier ruling was tantamount to "unilaterally adding special circumstances to the information" in violation of the California Constitution. His argument depends, however, on a premise we have already rejected: that the trial court lacked jurisdiction to reconsider its January 2021 order of dismissal. Because the trial court had jurisdiction to reconsider that order, its May 2021 order simply restored the District Attorney's original charging document.[7] Defendant's suggestion that there

---

[7] Although this is reason alone to reject defendant's argument, we also find it significant that the Legislature has, through section 1385, expressly given the court a role in determining whether enhancements or allegations (among other

15

was nothing to restore because a dismissal order is "effective for all purposes when so entered" conflates disparate issues. Defendant relies on *In re Anthony H.* (1982) 138 Cal.App.3d 159, which considered whether a dismissal order was entered and effective because dismissal under the particular statute at issue would "have the same effect as an acquittal for the purpose of double jeopardy analysis. [Citations.]" (*Id.* at 164.) Reconsideration in that context raises issues not applicable here.[8]

>  **B.**  **The Trial Court Adequately Investigated Potential Juror Misconduct and Did Not Err in Declining to Dismiss Juror No. 6**
>
>  **1.**  **Additional background**

After jury selection, but before trial began, Juror No. 6 alerted the trial court to a conversation he overheard in the courthouse hallway. Outside the presence of the other jurors, the trial court said to Juror No. 6, "I was told that[ ] when you were out there waiting in the hallway, someone approached you that wasn't one of your fellow jurors." Juror No. 6 responded, "They

---

things) should be tried notwithstanding a prosecutor's charging decisions.

[8]  Because we conclude the trial court had jurisdiction to reconsider its January 2021 dismissal order and its May 2021 order did not "add" special circumstances to the information, we do not consider the Attorney General's argument that the separation of powers doctrine is not implicated here "[b]ecause the [deputy district attorney] supported the reinstatement of the special circumstance allegations . . . ."

didn't approach me.  They sat to my left.  I was already sitting there.  I was the only one sitting there and they sat to my left." The trial court inquired, "Okay.  Did they engage you in conversation?"  Juror No. 6 responded, "Not with me.  They engaged with each other."  The trial court explained, "Okay.  It just so happens I think one or both of the people that sat next to you are going to be witnesses in this case.  You did nothing wrong here. . . .  And they did nothing wrong either because they don't know what they are supposed to do or not supposed to do."[9]

The trial court next asked Juror No. 6 whether he overheard the others' conversation.  He heard "[a] couple things. And then they were starting to talk about other things, and [he] turned to them and [he] said, 'To let you know, I'm a juror member so you probably shouldn't be talking.'"  The trial court asked Juror No. 6 to specify what he heard them talking about. Juror No. 6 "heard them say that they tried—the lady said to the guy, 'He didn't accept a plea deal?'  And the guy said, 'No, he didn't accept a plea deal.'  And then they whispered something, but [Juror No. 6] didn't hear that."  After discussing their drives to the courthouse, the people seated next to Juror No. 6 then "started to talk again.  And [Juror No. 6] leaned over to them and . . . said, 'I'm a jury member.' . . .  And they stopped.  And then [Juror No. 6] said . . . 'I'm just going to go sit over here,' and [he] moved."

---

[9]     The appellate record does not reveal the identities of the people who sat next to Juror No. 6, why the trial court believed they were potential witnesses, or whether they ultimately testified at trial.

17

The trial court inquired of Juror No. 6, "That portion that you heard, that he didn't take a plea deal, does that affect your ability to be fair and impartial?" Juror No. 6 responded, "No, because we kind of knew that last week, when we were—the very first day, sitting upstairs, when that other judge was talking to us and he says we're being delayed right now because they're trying to see if we can avoid court. So, in other words, [Juror No. 6] took that as they're trying to see if there's a plea deal. [¶] . . . [¶] And he told that to all 75 of us or however many were sitting in there." The trial court clarified, "Trying to see if we can avoid a trial." Juror No. 6 agreed, "That's what he said, 'We're trying to see if we can avoid a trial.'" The trial court asked, "So, in your mind, they were trying to work it out somehow?" Juror No. 6 answered yes. The trial court continued, "And[ ] when you were sent down here, obviously it didn't work out." Juror No. 6 again answered in the affirmative.[10]

---

[10] As we shall discuss, the actual record concerning plea negotiations is immaterial to our analysis of the impact (if any) of these statements on the jury. It is not clear, however, that plea negotiations caused any delay. On Monday, November 7, 2022, the trial court held a hearing at which it stated its "understanding . . . that there's going to be a plea; that the defendant will plead to counts [one] and [two]. It will be, as to count [one], life plus 25; count [two], life plus 25 consec[utive]. [¶] . . . [¶] For a total of life with a minimum parole eligibility date of 50 years." Defendant had signed a plea form, but he decided at the hearing to proceed to trial. The prosecution withdrew the offer, and the trial court indicated it would "order 82 [jurors], then, for Wednesday[, November 9, 2022]." The trial court heard motions in limine on the morning of Wednesday, November 9, 2022, but the reporter's transcript does not reflect

Neither defense counsel nor the prosecution asked to pose any questions to Juror No. 6 beyond the court's inquiry. Outside the presence of all the jurors, the trial court asked the attorneys to address Juror No. 6's statements. Defense counsel stated, "Yeah. I'm—I don't have an opinion one way or the other. I mean, I think—I prefer having jurors with zero contact with witnesses in an ideal world. I know it happens sometimes. This is a little bit more than riding in an elevator. So it could prejudice [defendant] with insider information." The prosecution said, "You know, it sounds like the juror doesn't have any feelings one way or another with that information, that there was a possible plea deal that . . . defendant didn't accept. [¶] I don't know if that raises [sic] to the level of prejudice so I'll defer to the court and counsel, whatever the court wants to do."

The trial court allowed Juror No. 6 to remain on the jury, explaining, "Well, we heard him. It was extremely brief. I mean, it wasn't any—it wasn't an opportunity to become even remotely chummy, chummy to the extent that there would be any sympathy or bias in favor of the individual who sat next to him. And they were aware that they were on a holding pattern because—that the matter was trying to be resolved so it's not—as he indicated, it wasn't a surprise to him. It's not something that he was not—already had figured out, in the sense that—and I think everyone, as a general proposition, understands that most cases are settled out of court, as a layperson can assess, even though it's settled in court. But what they mean is—when they say that, it means that it settled without a trial. So I think, . . .

---

any further plea negotiations before prospective jurors arrived in the courtroom that afternoon.

19

based on the fact that it wasn't earth-shattering news by any stretch of the imagination and the juror had the presence of mind to break it off right away, I'm going to allow him to remain."

### 2. *Legal framework*

"Each criminal defendant is entitled to an impartial jury. [Citations.] That entitlement imposes upon each juror a duty to maintain impartiality throughout the trial. [Citation.] The loss of impartiality requires dismissal of the juror. [Citation.] Loss of impartiality may result from a juror's receipt of information about the case that was not part of the evidence received at trial. [Citation.] A jury must be 'capable and willing to decide the case solely on the evidence before it,' lest a due process violation occur. [Citation.]" (*People v. Mora & Rangel* (2018) 5 Cal.5th 442, 482-483.)

"'The law is clear . . . that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute.' [Citation.] If a juror's ability to perform his or her duty is called into question, a court is expected to hold a hearing; failure to conduct a sufficient hearing constitutes an abuse of discretion. [Citation.] Following a hearing, the trial court may discharge a juror if it finds that the juror is unable to perform his or her duty. (§ 1089.)" (*Mora*, *supra*, 5 Cal.5th at 483.)

"Receipt of extraneous information is not '"misconduct" in the pejorative sense,' but it 'may require similar examination for probable prejudice.' [Citation.] If a sitting juror communicates with a nonjuror, there arises 'a rebuttable "presumption" of prejudice.' [Citation.] The presumption can be rebutted by demonstrating there is 'no substantial likelihood that one or more

20

jurors were actually biased against the defendant.' [Citation.] A substantial likelihood of bias may be found where the material was not inherently prejudicial but the totality of the circumstances suggest actual bias arose. [Citation.]" (*Mora, supra*, 5 Cal.5th at 484-485.)

### 3. *Juror No. 6*

Defendant contends the trial court erred by failing to dismiss Juror No. 6 or, in the alternative, by failing to adequately inquire into whether Juror No. 6 could be fair and impartial. We assume for the sake of argument that these issues are preserved for appeal notwithstanding the lack of any request that the trial court inquire as to the potential impact of the judicial officer's statement and, as to remarks Juror No. 6 overheard in the hallway, defense counsel's statement that he had no "opinion one way or the other."[11]

Defendant's contention that the trial court "did not get a direct answer from Juror No. 6 whether he could be fair and

---

[11] As a general matter, challenges to the trial court's decision not to dismiss a juror are subject to forfeiture, but challenges to the trial court's failure to inquire into potential misconduct where the trial court possesses information that might constitute good cause to remove a juror are not. (*People v. Cowan* (2010) 50 Cal.4th 401, 506 [holding that the duty to inquire in such circumstances "rests with the trial court whether or not the defense requests an inquiry"]; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1169-1170 [holding that a defendant forfeits a challenge to the trial court's failure to dismiss a juror "when defense counsel does not 'propose additional questions [be asked of jurors], object to any juror's continued service, or request a mistrial on the ground of juror misconduct'"].)

impartial" is not accurate. In defendant's view, Juror No. 6 only answered the trial court's question as to whether the statements he overheard in the hallway "affect[ed] [his] ability to be fair and impartial" and defendant believes this does not rule out the possibility that Juror No. 6 was *already* unable to be fair and impartial in light of the other judicial officer's statement that they were trying to see if they could avoid a trial. The most natural reading of the trial court's question, however, is that both the court and Juror No. 6 took his pre-contact impartiality to be presumed. He was, after all, subject to voir dire and swore an oath to render a "true verdict . . . according only to the evidence presented . . . and to the instructions of the court" *after* the other judicial officer addressed him and the other prospective jurors.[12] In this context, Juror No. 6's assurance that he could be fair and impartial was not ambiguous.

Defendant further contends Juror No. 6's "one-word response to the court's . . . question was not remotely sufficient" to ensure his ability to be fair and impartial. Again, defendant ignores important context. Juror No. 6 proactively raised the issue of remarks overheard in the hallway. (*Mora, supra*, 5 Cal.5th at 484 [holding that the trial court's inquiry into a juror's impartiality was adequate because, among other things, the juror herself "prompt[ly] . . . communicate[d] the potential issue to the court"].) Indeed, prior to this, immediately after taking the oath, Juror No. 6 had demonstrated his conscientiousness by asking,

---

[12] In voir dire, Juror No. 6 affirmed that various experiences—ranging from relationships with lawyers and law enforcement personnel to his having been a victim of armed robbery—did not affect his ability to be fair and impartial.

"hypothetically," what he should do if someone he knew entered the courtroom.[13]  In short, the trial court did not abuse its discretion in determining that this juror would offer a considered and sincere assessment of his impartiality.

Apart from challenging the adequacy of the trial court's inquiry, defendant also believes Juror No. 6's knowledge that defendant did not accept a plea deal necessarily influenced his assessment of the case.  In so arguing, defendant relies on a nonbinding federal case, *United States v. Galindo* (9th Cir. 1990) 913 F.2d 777, and a plurality opinion from another nonbinding out-of-state court, *Blue v. State* (Tex. Crim. App. 2000) 41 S.W.3d 129.[14]  As we shall explain, however, these cases are not persuasive because they involved disclosures to jurors suggesting the defendants were actively involved in plea negotiations. Defendant's suggestion that Juror No. 6 "found out that [he] had considered pleading guilty" or "seriously considered entering into a plea agreement" does not accurately reflect what Juror No. 6 said he heard.

In *Galindo*, the defendants and the prosecution "engaged in plea negotiations" during a recess in the trial "and arrived at a proposed disposition of the case." (*Galindo*, *supra*, 913 F.2d at 778.)  The trial court rejected the proposed agreement and,

---

[13]     Later, during trial, Juror No. 6 notified the trial court that he overheard another hallway conversation to the effect that a juror had been excused because she knew a family member of one of the victims.

[14]     Texas courts have emphasized "the *Blue* decision has no precedential value" even in that jurisdiction.  (*Unkart v. State* (Tex. Crim. App. 2013) 400 S.W.3d 94, 101.)

"[s]hortly thereafter, . . . explained to the jury the reason for the delay: 'We had this delay. There was a big long argument as to whether or not there could be a plea bargain worked out where there would be a plea recommended sentencing but I couldn't get together.'" (*Ibid.*) On appeal, the defendants argued that "at least some of the jurors must have assumed that only guilty defendants engage in plea discussions" and the Ninth Circuit "agree[d] that the jury should not be exposed to this kind of information in a criminal case." (*Id.* at 779.) The Ninth Circuit affirmed the judgment, however, because there was no reasonable possibility that the statement contributed to the jury's verdict. (*Id.* at 779-780.)

Here, neither statement reported by Juror No. 6 suggested "a big long argument as to whether or not there could be a plea bargain worked out" as in *Galindo*. Indeed, unlike in *Galindo*, there was no indication to any juror that defendant was participating in negotiations as opposed to merely rejecting offers by the prosecution. (*Mora, supra*, 5 Cal.5th at 484 ["The refusal of a guilty plea, of course, is not necessarily indicative of culpability and may instead be consistent with a defendant's belief in his innocence or reduced culpability"].) Moreover, although the court's remark in *Galindo* that "I couldn't get together" is not altogether clear, it is likely the jurors interpreted it to mean that the defendant had actually entered into a plea agreement that the court rejected. There was no such implication in the statements that Juror No. 6 reported.

In *Blue*, a judicial officer "apologized to a group of prospective jurors for their long wait." (*Blue, supra*, 41 S.W.3d at 130.) He went on to explain, among other things, that "the [defense] attorney has been speaking to his client about what

24

does he want to do. And when you are on the button like these cases, it's a question. Frankly, an offer has been made by the State or do I go to trial. And he has been back and forth so I finally told him I had enough of that, we are going to trial. You have been sitting out here and this is holding up my docket and I can't get anything done until we know if we are going to trial or not. [¶] Frankly, obviously, I prefer the defendant to plead because it gives us more time to get things done and I'm sure not going to come out here and sit. Sorry, the case went away and we were all trying to work toward that and save you time and cost of time, which you have been sitting here and I apologize about that. I told the defendant that. Like I said, I have enough of this and going to trial." (*Ibid.*) The plurality opinion of Texas's high court for criminal appeals held that "the judge's comments imparted information to the venire that tainted the presumption of innocence. A juror who knows at the outset that the defendant seriously considered entering into a plea agreement no longer begins with a presumption that the defendant is innocent. A juror who hears the judge say that he would have preferred that the defendant plead guilty might assume that the judge knows something about the guilt of the defendant that the juror does not." (*Id.* at 132.)

Here, again, there was no indication to Juror No. 6 that defendant was "seriously considering" pleading guilty. Although, as it happens, defendant was considering accepting a plea deal, the statements overheard by Juror No. 6 did not convey that. Also unlike in *Blue*, the judicial officer who addressed the prospective jurors in this case did not express a preference that defendant should plead guilty.

25

In sum, even if we assume the statements reported by Juror No. 6 together give rise to a rebuttable presumption of prejudice, the trial court conducted an appropriate inquiry and correctly determined his conscientiousness in reporting the issue and his assurance that he could be fair and impartial demonstrate there is no substantial likelihood that he was actually biased against defendant. (*Mora, supra*, 5 Cal.5th at 485.)

### 4. *Other members of the jury*

Defendant contends that even if the trial court adequately investigated Juror No. 6's potential bias and properly concluded his dismissal was not necessary, it erred in failing to investigate whether other members of the jury could be fair and impartial in light of the judicial officer's statement that they were trying to see if they could avoid a trial.

"Not every incident [of potential juror misconduct] warrants investigation," and "[t]he decision whether, and to what extent, investigation into possible juror bias is required "'rests within the sound discretion of the trial court.'" [Citations.]" (*People v. Bell* (2019) 7 Cal.5th 70, 120; accord *Cowan, supra*, 50 Cal.4th at 506.) Here, the judicial officer's statement was ambiguous and the jurors were subsequently subject to voir dire. Although they were not specifically questioned regarding the judicial officer's statement, all indicated they could be fair and impartial and swore an oath to render a verdict based on the evidence and the trial court's instructions. Under these circumstances, the trial court reasonably concluded there were no grounds for believing good cause might exist to excuse any of the jurors and no inquiry was necessary. (*Cowan, supra*, at 508.)

Defendant contends the trial court must inquire of jurors "even when the possibility of bias [is] essentially speculative." Defendant relies on *People v. Adcox* (1988) 47 Cal.3d 207, in which the defendant argued jurors may have read news reports in which the prosecution allegedly discussed the trial. (*Id.* at 252.) Although there was no evidence that any of the jurors actually read the articles in question—and our Supreme Court ultimately concluded the record was insufficient to evaluate a claim of juror misconduct—"the better and proper course of action . . . would have been for the [trial] court 'to make whatever inquiry [was] reasonably necessary' to determine if there was in fact any misconduct . . . ." (*Id.* at 253-254.) In contrast to *Adcox*, where there were unresolved factual issues concerning what the articles reported and whether any jurors read them, here there is no existing dispute as to what the judicial officer said to the prospective jurors, and what was said was quite oblique—there are many ways a trial can be avoided without an admission of guilt by a defendant (e.g., a court's dismissal of charges for insufficient evidence). The trial court was within its discretion in deciding not to raise the judicial officer's comment with all the jurors (at least some, and maybe many, of whom likely paid no attention to it).

> C. *Defendant Forfeited His Challenge to the Trial Court's Admission of the Unredacted Recording of Rodriguez's Interview*
> 1. *Additional background*

At the outset of Rodriguez's trial testimony, the jury learned he was serving a state prison sentence for a 2020 kidnapping conviction. After testifying that he lived on Cosbey

27

Street in December 2017 and the home was fairly characterized as a trap house, Rodriguez claimed he was unable to recall circumstances surrounding Ryan and Dominguez's deaths. He testified his memory was "very clouded" because he was "always heavily intoxicated" around that time. He further indicated he wanted "no part" in the trial because "[e]verybody loses in this scenario, and [he] just want[ed] to move forward with [his] life."

After Rodriguez acknowledged speaking with detectives in January and February 2018 and having his memory refreshed on certain issues after reviewing the transcripts, he testified that reviewing the transcripts would not refresh his recollection as to other issues. At sidebar, the prosecution requested permission to play the February 2018 interview in its entirety. Among other things, as we have already mentioned, Rodriguez told investigators that defendant confessed to having killed Ryan and Dominguez.

Defense counsel "object[ed] and submit[ted]" without further argument, and the trial court ruled the prosecution would be allowed to play the recording. Following a recess, and before the recording was played for the jury, defendant's attorney "flesh[ed] . . . out" his objection. He explained, "It appears to be the full . . . interview. In the interview, Mr. Rodriguez asserts he knows who the murderer is, who committed it, even though he has no personal knowledge of it. There is a discussion of gangs. There is discussion of the gun. And I think it's not appropriate for the jury to hear Mr. Rodriguez telling [investigators] his knowledge of the murder when he was not present." The trial court again overruled the objection, explaining that Rodriguez's statements concerning the killer's identity were based on

28

defendant's confession to him and that it planned to give a limiting instruction regarding gang evidence.

The recording of the February 2018 interview is over an hour long, and the transcript runs 108 pages. It was played for the jury in its entirety.

Defendant's assignment of error does not challenge the substance of Rodriguez's statements to investigators but rather the investigators' statements to Rodriguez. Throughout the interview, Rodriguez expressed fear of retaliation should he cooperate in the investigation. The investigators assured him he would be protected and repeatedly asserted they already knew defendant was responsible for the killings.[15] They made comments suggesting they had evidence of defendant's guilt they were not disclosing to Rodriguez. In one exchange, for instance, a detective told Rodriguez they "wouldn't be here unless [they had] done [their] homework" and explained that, "A lot of times when [they] sit down with somebody, it's because [they] wanna see what [that person] ha[s] to say after [the investigators] already know something." The detective emphasized "right now is the time to 'come to Jesus moment' and just tell what really happened" because, although the investigators could not "put

---

[15] Among other things, defendant cites instances in which the investigators mentioned "the gun . . . [defendant] killed these two guys with," referred to defendant as a "[f]uck[i]n idiot [who] killed your friends" and a "fucker [who] killed, basically, a best friend," suggested that defendant's killing Ryan and Dominguez in the Cosbey residence "disrespected [Rodriguez's] dad," stated that defendant was "the one that killed these guys," and urged Rodriguez to help make sure "this fucker never sees the light of day again."

29

words in [Rodriguez's] mouth," they were asking "some pretty simple questions [they] already ha[d] answers to."  The other investigator emphasized "[e]verybody in the neighborhood kn[ew] [defendant] did this."

### 2.    *Analysis*

Defendant contends the trial court abused its discretion in permitting the prosecution to play the recording of Rodriguez's February 2018 interrogation because the investigators' statements asserting defendant was the killer and hinting at undisclosed evidence of his guilt violated his constitutional rights to confrontation and a fair trial.

Although plaintiff raised other objections to the recording, he forfeited the argument he makes now focused on the investigators' statements by failing to object on that ground in the trial court.  (*People v. Nadey* (2024) 16 Cal.5th 102, 150 ["Failure to object on the specific ground later asserted . . . forfeits that ground on appeal"]; *People v. Robinson* (2024) 99 Cal.App.5th 1345, 1356 ["An evidentiary objection made on one ground in a trial court does not preserve a challenge based upon a different ground in an appellate court"]; Evid. Code, § 353.)  Defendant argues, however, that his attorney's prefatory remark in his "flesh[ed] . . . out" objection that "[i]t appears to be the full . . . interview" was "sufficient to fairly apprise the court that the transcript should be properly redacted . . . ."  But defendant's attorney elaborated by identifying the other material from the full interview that he believed should be redacted, and he expressed no concern about the investigators' statements.

There was accordingly no proper objection on that ground.[16] (*Robinson*, *supra*, at 1357 [emphasizing that an objection must inform the trial court and opposing party "of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling"].)

Citing *In re Sheena K.* (2007) 40 Cal.4th 875, defendant asks us to exercise our inherent discretion to review "a forfeited claim involv[ing] an important issue of constitutional law or a substantial right." (*Id.* at 887, fn. 7.)  Our Supreme Court emphasized, however, that its holding in *Sheena K.* was "in accord with [a] limited exception—for constitutional claims initially raised on appeal when closely related to claims raised at trial regarding the admission or exclusion of evidence—to the established rule that a forfeited claim of trial court error in admitting or excluding evidence is not subject to discretionary appellate review." (*Id.* at 887, fn. 7.)  Because that "limited

---

[16]    Defendant also contends his failure to object to the investigators' statements is excused because objection would have been futile.  Although defendant does not challenge the trial court's ruling on his hearsay objection to Rodriguez's statements, he assumes the objection was meritorious and suggests the trial court's ruling demonstrates any other objection to the recording would have been futile.  Even if defendant were correct that the trial court abused its discretion in admitting portions of the recording in which Rodriguez identified defendant as the killer, this would not establish the futility of an objection to the investigators' statements.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 31, fn. 8 [ruling on earlier objections did not demonstrate futility of objecting "on different, if somewhat related, points"].)

exception" to forfeited claims of evidentiary error does not apply here, we decline to undertake a discretionary review.

Defendant's alternative contention that his attorney's failure to object to the investigators' statements amounted to ineffective assistance of counsel also lacks merit. "'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694[ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].)'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) "'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' [Citation.]" (*Ibid.*; accord *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had 'no rational tactical purpose' for an action or omission"].)

We cannot say on the record we have that there was no rational tactical purpose for trial counsel's failure to object to the investigator statements challenged only now. Contrary to defendant's argument, the fact that his attorney objected to *some* portions of the interview does not demonstrate that he would have benefited by excluding *any* portion of the interview. Defendant's attorney might well have reasoned that, having failed to exclude Rodriguez's statements concerning defendant's

confession, the challenged statements by the investigators were unlikely to carry significant weight with the jury and could help to demonstrate Rodriguez was unreliable.  It appeared, for instance, that the investigators were bluffing as to some of the evidence against defendant, including when they told Rodriguez they had the murder weapon.[17]  The investigators' leading questions also supported the theme in defendant's closing argument: that Rodriguez's substance abuse impacted his memory.  Additionally, the investigators' suggestion that Rodriguez might face charges in this case—they reminded him the killings happened at his home and stressed he did not "wanna take the fall for this bullshit"—supplied a potential motive for Rodriguez to tell them what they wanted to hear.

> D. *Any Error in Failing to Instruct the Jury on Accomplice Testimony Was Harmless*

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony.  [Citation.]  This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence.  [Citation.]" (*People v. Houston* (2012) 54 Cal.4th

---

[17]    No firearm was presented at trial.  After one of the investigators asked Rodriguez where the murder weapon was, the other cut off Rodriguez's answer to say, "We have it," at which point the investigators asked Rodriguez which of his "homeboys" had been "busted for a strap recently," emphasizing they "already kn[e]w" and just "want[ed] [Rodriguez] to tell [them]."

1186, 1223.) This rule applies to both accomplice testimony and out-of-court statements "'"'made under suspect circumstances,'"'" including, "'"most obvious[ly],'"'" statements made "'"when the accomplice has been arrested or is questioned by the police." [Citation.]'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 946.) "The reason most often cited in support of these instructions is that an accomplice is inherently untrustworthy because he or she 'usually testif[ies] in the hope of favor or the expectation of immunity.' [Citation.] In addition, an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability. [Citation.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)

Here, defendant does not argue reversal is required based on the trial court's failure to instruct the jury that accomplice testimony must be corroborated. His sole contention is that the jury should have been instructed to view Rodriguez's testimony and statements to investigators with caution. The relevant portion of CALCRIM No. 334 instructs that "[a]ny (statement/ [or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/ [or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

We assume for the sake of argument that a jury could find Rodriguez was an accomplice to the charged murders and the trial court should have instructed the jury to view his testimony and statements implicating defendant with caution. Any error, however, was harmless.

Defendant contends reversal is required unless the error was harmless beyond a reasonable doubt, but this standard does not apply because the duty to instruct on accomplice liability is

34

rooted in state statutory and common law. (*Chapman v. California* (1967) 386 U.S. 18, 24 [discussing harmlessness standard applicable to "federal constitutional error"].) Instead, we consider whether it is reasonably probable the result at defendant's trial would have been different had the jury been instructed to view Rodriguez's statements and testimony with caution. (*People v. Williams* (2010) 49 Cal.4th 405, 456 [applying the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 and concluding "it [was] not reasonably probable the result at [the] defendant's trial would have been different" but for the omission of an accomplice instruction because "[t]he jury would have been inclined to view [the alleged accomplice's] testimony with caution even in the absence of an instruction that it do so"].)

As we have already discussed, although Rodriguez was not arrested in connection with this case, investigators emphasized his potential exposure in statements including, "It's your house. [¶] . . . [¶] [and] [l]ike you said, you don't wanna take the fall for this bullshit." The jury was therefore keenly aware of the pressures that counsel caution in evaluating accomplice testimony. (*Williams*, *supra*, 49 Cal.4th at 456.)

Other instructions also made the jury aware of considerations the omitted instruction is intended to highlight. An instruction based on CALCRIM No. 226 listed factors that may be considered in assessing witness credibility, including whether the witness was "influenced by . . . a personal interest in how the case is decided[.]" (*People v. Gonzalez & Soliz* (2011) 52 Cal.4th 254, 304 [holding that the failure to give an accomplice instruction was harmless where, among other things, "[t]he jury . . . would have used the witness credibility instructions it was given in evaluating the truth of [the accomplice's]

testimony"]; *People v. Lewis* (2001) 26 Cal.4th 334, 371 ["To the extent [the] defendant argues the jury should have been instructed to view [an accomplice's] testimony with distrust [citation], we find the other instructions given . . . were sufficient to inform the jury to view [this] testimony with care and caution"].)  More significantly, the probative value of Rodriguez's statements and testimony resided chiefly in his disclosure of statements made by defendant, and the jury was instructed that it must view these with caution regardless of who testified to them.  Specifically, the trial court gave an instruction based on CALCRIM No. 358 directing the jury, in part, to "[c]onsider with caution any statement made by a defendant tending to show . . . guilt unless the statement was written or otherwise recorded."[18]

In light of the jury's knowledge of the context in which Rodriguez made statements incriminating defendant and other instructions explaining that the jury should view these with caution, it is not reasonably probable that defendant would have obtained a more favorable outcome if an accomplice instruction had been given.

---

[18]    Defendant's attorney emphasized this instruction in his closing argument, reminding the jury that "in the jury instructions it tells you if you get a statement from Raymond Gonzalez that's not recorded or not written, you should take that with caution.  Caution.  Caution."  Counsel then tied this instruction to Rodriguez's credibility, arguing, "[Rodriguez] is a drug abuser, he has felony convictions, and what he's trying to pin on [defendant] wasn't even recorded and you want to pin your entire case on that?  That's not enough.  Not for two murders."

*E.    The Prosecution's Reference to Defendant as a "Monster" Did Not Violate the Racial Justice Act*

*1.    Additional background*

Near the end of its closing argument, the prosecution remarked that "[Ryan] and [Dominguez] were innocent victims in this case.  They did not live an exemplary life.  They had substance abuse problems.  They did not associate with people who had their best interest at heart, but they absolutely did not deserve to be executed in a trap house in Baldwin Park weeks before Christmas in 2017.  [¶]  They had loved ones.  They had family.  They had entire lives ahead of them.  They had goals.  They had dreams and aspirations, but what they didn't have was control over their desire for substance abuse, for heroin, for Xanax, for methamphetamines.  [¶]  And what those substance abuse problems caused was them to go into places that they normally probably would never go before, into a monster's den and pass out at the feet of a monster.  [¶]  [Defendant] is responsible for their murders."

*2.    The Racial Justice Act*

The Legislature enacted the Racial Justice Act (RJA) "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing."  (Stats. 2020, ch. 317, § 2(i).)  Among other things, the Legislature sought to eliminate "the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials."  (Stats. 2020, ch. 317, § 2(e).)  The Legislature found that such "racially incendiary or racially coded language" was "tolerate[d]" in "[e]xisting precedent," with courts upholding "convictions in cases where

prosecutors have compared defendants who are people of color to Bengal tigers and other animals, even while acknowledging that such statements are 'highly offensive and inappropriate' [citation]." (Stats. 2020, ch. 317, § 2(e).) The Legislature concluded that "[b]ecause use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system [citations]." (Stats. 2020, ch. 317, § 2(e).)

Section 745, subdivision (a)(1) prohibits attorneys and others from "exhibit[ing] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." Subject to exceptions not relevant here, section 745, subdivision (a)(2) prohibits attorneys and others from "us[ing] racially discriminatory language [at trial] about the defendant's race, ethnicity, or national origin, or otherwise exhibit[ing] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." The statute defines "racially discriminatory language" to include "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).)

38

###### *3.* *Analysis*

Defendant forfeited his RJA claim by failing to object to the prosecution's characterization of him as a "monster" in the trial court. (*People v. Lashon* (2024) 98 Cal.App.5th 804, 810-815.) Even if the issue were preserved for appeal, however, defendant's position lacks merit.[19]

Defendant contends the prosecution's characterization of him—"a Hispanic man"—as a monster was "dehumanizing and racially charged." He relies on several non-California cases in which courts have criticized arguments characterizing criminal defendants as "monsters" as improper appeals to juries' passions and prejudices, but in which the defendants' race did not expressly factor into the courts' reasoning. (See, e.g., *Lawson v. State* (Md. Ct. App. 2005) 886 A.2d 876, 891-893; *Malicoat v. State* (Okla. Ct. Crim. App. 2000) 992 P.2d 383, 401; *Malicoat v. Mullin* (10th Cir. 2005) 426 F.3d 1241, 1256.) The RJA only applies to racial animus and racially discriminatory language—not inflammatory language generally—and our Supreme Court has held, as a general matter, that describing a defendant as "monstrous" is not necessarily improper. (*People v. Farnam* (2002) 28 Cal.4th 107, 168.)

Defendant also cites two non-California cases in which courts construed the term "monster" as perpetuating racist stereotypes against Black defendants. In *Bennett v. Stirling* (4th Cir. 2016) 842 F.3d 319, the prosecution described the defendant as a "'huge, giant man, six-six, six-seven, brutal monster size,'"

---

[19] Because we address defendant's RJA claim on the merits, we need not discuss whether the failure to object amounted to ineffective assistance of counsel.

and went on to refer to him as "King Kong," "a 'caveman,' a 'mountain man,' a 'monster,' a 'big old tiger,' and '[t]he beast of burden.'" (*Id.* at 321, 326.) In *Belton v. State* (Md. Sup. Ct. 2023) 295 A.3d 612, an intermediate appellate court likened the defendant "to Grendel, the mythical monster in the Old English epic, *Beowulf*," and, among other things, contrasted his co-defendant mother with "more elderly White mothers and grandmothers depicted by Whistler, Rockwell, and Currier & Ives" and drew "a racialized contrast between the African American neighborhood where the events of this case took place and the mostly White settings traditionally depicted in Hallmark Hall of Fame programs." (*Id.* at 615, 629.)

In both *Bennett* and *Belton*, the surrounding context gave the term "monster" an unmistakable racial and animalistic character. In this case, however, "an objective observer" would not read the isolated use of the word "monster" to appeal to racial biases or to compare defendant to an animal. (§ 745, subd. (h)(4).) Defendant's suggestion that use of the word "monster" necessarily violates the RJA because Merriam-Webster defines the term to include "an animal of strange or terrifying shape" is undermined by the same dictionary's definition of the term to refer to "one who deviates from normal or acceptable behavior or character." (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/monster> [as of Aug. 20, 2024].) Under established law, we infer the prosecution's closing argument employed the latter sense of the word. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129 ["'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements'"].)

*F.      Defendant Forfeited His Claim of Prosecutorial
        Misconduct*

*1.      Additional background*

In its rebuttal argument, the prosecution said, "yes, Eduardo Rodriguez is a very powerful witness in this case and he's a very powerful witness in this prosecution and I take no pleasure in dragging a man out of state prison and putting him in the public forum of a murder trial to testify and to go on the record knowing very well that in his heart he knows exactly the dangers that come along with that.  But it is so vital to this case. It is so vital to seek justice and to seek the truth and to really get out before the jury what happened that it is a necessity that I, the prosecutor, take responsibility myself and myself alone to put a man like Eduardo Rodriguez in danger so you, ladies and gentlemen, who have the job of deciding the truth in this case can evaluate as best you can what the truth is."

*2.      Analysis*

Defendant contends the prosecution improperly "invoked the prestige of [its] office to vouch for Rodriguez, appealed to the sympathies and prejudices of the jury, and suggested [it] had evidence not before the jury" in this portion of its rebuttal. Because defendant did not object in the trial court, however, the issue is forfeited.

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.  [Citations.]  'The primary purpose of the requirement that a defendant object at trial to

41

argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) Defendant contends this case falls within an exception to the forfeiture rule because an admonition would not have cured the harm caused by the prosecution's remarks.[20] (*Ibid.*) He does not explain, however, why an admonition that there was no evidence Rodriguez's testimony exposed him to danger would not have been sufficient to cure any misconduct.[21]

Defendant alternatively contends his trial attorney was ineffective for not objecting to the challenged statements.[22] The

---

[20] Defendant takes inconsistent positions on this point in his opening brief on appeal. In the portion of the brief discussing the need for an accomplice instruction, defendant contends "the prosecutor improperly invoked the prestige of his office to vouch for Rodriguez's otherwise abysmal credibility [citation], and [an accomplice] instruction likely would have negated that."

[21] Defendant cites *United States v. Weatherspoon* (2005) 410 F.3d 1142 to establish that *no* admonition may overcome misconduct "affect[ing] the jury's ability to consider the totality of the evidence fairly," but the Ninth Circuit in fact held that the curative instructions given in that case "did not deliver the required strong cautionary message," failed to "'mention the specific statements of the prosecutor[,] and were not given immediately after the damage was done[.]' [Citation.]" (*Id.* at 1151-1152.) Nothing in *Weatherspoon* implies that a different admonition would not have been sufficient.

[22] We decline defendant's request that we exercise our discretion to review this forfeited claim for the same reasons we conclude defense counsel was not ineffective for failing to object.

record sheds no light on why defendant's attorney failed to object, and defendant suggests "'there simply could be no satisfactory explanation.' [Citation.]" (*Carter, supra*, 36 Cal.4th at 1189.) Defendant's attorney might well have believed, however, that Rodriguez seemed genuinely fearful both at trial and in speaking with investigators. Because that fear arguably bolstered Rodriguez's credibility regardless of whether it was well founded and regardless of the prosecution's personal view of its significance, it would have been reasonable to conclude that an objection would draw further attention to the issue. (*People v. Milner* (1988) 45 Cal.3d 227, 245 ["Defense counsel would . . . have been well within the bounds of reasonable competence had he chosen to ignore [the prosecution's] statements rather than draw attention to them with an objection"], disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

## G.  *Cumulative Error*

Defendant argues that even if none of the purported errors we have discussed individually requires reversal, they cumulatively prejudiced his right to a fair trial and compel reversal. The contention is meritless. (*People v. Edwards* (2013) 57 Cal.4th 658, 767; *People v. Woods* (2015) 241 Cal.App.4th 461, 489.)

43

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.